PENNWALT CORPORATION, Appellant/Cross-Appellee,

v.

DURAND–WAYLAND, INC., Appellee/Cross-Appellant.

Appeal Nos. 85–1882, 85–1933.

United States Court of Appeals, Federal Circuit.

Nov. 6, 1987.

Joel S. Goldhammer, Seidel, Gonda & Goldhammer, P.C., Philadelphia, Pa., argued for appellant/cross-appellee. With him on the brief were Gregory J. Lavorgna and Steven J. Rocci, Philadelphia, Pa., of counsel.

George M. Hopkins, Newton, Hopkins & Ormsby, Atlanta, Ga., argued for appel-lee/cross-appellant. With him on the brief was Todd Deveau, Atlanta, Ga.

Before MARKEY, Chief Judge, FRIEDMAN, RICH and DAVIS, Circuit Judges, COWEN and BENNETT, Senior Circuit Judges, and SMITH, NIES, NEWMAN, BISSELL, ARCHER and MAYER,[*] Circuit Judges.[**]

BISSELL, Circuit Judge, filed an opinion, in which MARKEY, Chief Judge, FRIEDMAN, RICH, DAVIS, NIES and ARCHER, Circuit Judges, joined; BENNETT, Senior Circuit Judge, filed a dissent-in-part, in which COWEN, Senior Circuit Judge, SMITH and NEWMAN, Circuit Judges, joined. NIES, Circuit Judge, filed additional views; NEWMAN, Circuit Judge, filed a commentary.

BISSELL, Circuit Judge.

This appeal and cross-appeal are from a judgment of the United States District Court for the Northern District of Georgia, 225 USPQ 558 (N.D.Ga.1984). The district court found that Durand-Wayland's accused devices do not infringe any claim, literally or under the doctrine of equivalents. Unable to view that finding as clearly erroneous under Fed.R.Civ.P. 52(a), we affirm the judgment of noninfringement and vacate, as moot, that part of the judgment concerning the validity of Pennwalt's patent.

## BACKGROUND

Pennwalt sued Durand-Wayland for infringing claims 1, 2, 10 and 18 (claims-at-issue) of its U.S. Patent No. 4,106,628 (the '628 patent) on an invention of Aaron J. Warkentin and George A. Mills, entitled "Sorter for Fruit and the Like." Following a nonjury trial on the issues of patent infringement and validity, the district court, on March 22, 1984, issued an opinion concluding that (1) the claims-at-issue were

* MAYER, Circuit Judge, took no part in the consideration or decision of this case.

** This case was argued before a panel consisting of Bennett, Circuit Judge, Cowen, Senior Circuit Judge, and Nies, Circuit Judge, on October 11, 1985. An active judge not on the panel suggested in banc consideration and the court so decides the case. Judge Bennett assumed senior status on March 1, 1986.

not anticipated by the prior art, (2) the '628 patent had not run afoul of the "on sale" bar of 35 U.S.C. § 102(b) (1982), and (3) the accused devices did not infringe any of the claims-at-issue, either literally or under the doctrine of equivalents. In an unpublished supplemental order of April 26, 1984, the district court concluded as a matter of law that the claims-at-issue would not have been obvious in light of the prior art.

Pennwalt appeals from the district court's holding of noninfringement, both literally and under the doctrine of equivalents, and its award of costs against Pennwalt. Durand-Wayland appeals from the district court's validity holdings and its denial of Durand-Wayland's request for recovery of its attorney fees.

## ISSUE

Our disposition of this appeal requires resolution of the single question of whether the district court's finding of no infringement was clearly erroneous.

## OPINION

The '628 patent claims a sorter. The principal object of the invention is to provide a rapid means for sorting items, such as fruit, by color, weight, or a combination of these two characteristics. The sorter recited in claims 1 and 2 conveys items along a track having an electronic-weighing device that produces an electrical signal proportional to the weight of the item, along with signal comparison means, clock means, position indicating means, and discharge means, each of which performs specified functions. The specification describes the details of a "hard-wired" network consisting of discrete electrical components which perform each step of the claims, e.g., by comparing the signals from the weighing device to reference signals and sending an appropriate signal at the proper time to discharge the item into the container corresponding to its weight. The combined sorter of claims 10 and 18 is a multifunctional apparatus whereby the item is conveyed across the weighing device and also carried past an optical scanner that produces an electrical signal pro-

portional to the color of the item. The signals from the weighing device and color sensor are combined and an appropriate signal is sent at the proper time to discharge the item into the container corresponding to its color and weight.

Durand-Wayland manufactures and sells two different types of sorting machines. The first accused device, the "Microsizer," sorts by weight only and employs software labeled either Version 2 or Version 5. The second accused device employs software labeled Version 6 and sorts by both color and weight through the use of the "Microsizer" in conjunction with a color detection apparatus called a "Microsorter."

A more complete description of the claimed invention and of the accused devices is set forth in the district court's opinion. *Pennwalt*, 225 USPQ at 559–60. The claims-at-issue are set forth in the district court's opinion. *Id.* at 564–65.

## I.

### *Literal Infringement*

Pennwalt asserts on appeal that all limitations set forth in claims 1 and 2 and some limitations set forth in claims 10 and 18 can be read literally on the accused devices. Pennwalt contends that the district court erred in interpreting the claims by going beyond the means-plus-function language of a claim limitation and comparing the structure in the accused devices with the *structure* disclosed in the specification. Such comparison allegedly resulted in the court's reading nonexistent structural limitations into the claims. Pennwalt relies on the statement in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950): "If accused matter falls clearly within the claim, infringement is made out and that is the end of it." In view of the literal breadth of means-plus-function language in the claims, that "test" for literal infringement would encompass *any* means that performed the function of a claim element. 35 U.S.C. § 112 (1982). This is not the "test." The *Graver Tank* statement predated the inclusion in the 1952 Act of the

provision specifically permitting "means" limitations, section 112, paragraph 6. *See* P. Federico, *Commentary on the New Patent Law*, 35 USCA 1, 25 (1954). As Judge Rich, one of the drafters of the statute, stated in a 1952 address explaining the import of section 112, paragraph 6:

If you adopt this practice, that element or step is to be construed—shall be construed (it is mandatory)—to cover the corresponding structure, material or acts described in the specification and equivalents thereof.

Address before the New York Patent Law Association (November 6, 1952), *reprinted in* R. Calvert, *The Encyclopedia of Patent Practice and Invention Management* 17, "Section 112—Means Claims" (1964).

Thus, section 112, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim *literally* satisfies that limitation. While encompassing equivalents of those disclosed in the specification, the provision, nevertheless, acts as a restriction on the literal satisfaction of a claim limitation. *Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196, 1201, 1 USPQ2d 2052, 2055 (Fed.Cir.1987). If the required function is not performed *exactly* in the accused device, it must be borne in mind that section 112, paragraph 6, equivalency is not involved. Section 112, paragraph 6, plays no role in determining whether an equivalent function is performed by the accused device under the doctrine of equivalents.

■ Thus, it was not legal error (as Pennwalt asserts) for the district court to have made a comparison between Durand-Wayland's structure and the structure disclosed in the specification for performing a particular function. The statute means exactly what it says: To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure *with the disclosed structure*, and must find equivalent *structure*

as well as *identity* of claimed *function* for that structure. *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 975, 226 USPQ 5, 8 (Fed.Cir. 1985); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir. 1985); *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 731 F.2d 840, 848, 221 USPQ 657, 663 (Fed.Cir.1984).

■ Where the issue is raised, it is part of the ultimate burden of proof of the patent owner to establish, with respect to a claim limitation in means-plus-function form, that the structure in the accused device which performs that function is the same as or an equivalent of the structure disclosed in the specification. In essence, Pennwalt erroneously argues that, if an accused structure performs the function required by the claim, it is per se structurally equivalent. That view entirely eliminates the section 112, paragraph 6, restriction and has been rejected in the above-cited precedent of this court.

■ We need not, and do not, determine whether the district court correctly found no equivalency in structure because the district court also found that the accused devices, in any event, did not perform the same functions specified in the claim. For example, the district court found that the accused devices had no position indicating means which tracked the location of the item being sorted. That finding negates the possibility of finding literal infringement.

## II.

### *Infringement under the Doctrine of Equivalents*

■ Under the doctrine of equivalents, infringement *may* be found (but not necessarily [1]) if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention. *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d

---

**1.** The doctrine of equivalents is limited in that the doctrine will not extend (1) to cover an accused device in the prior art, and (2) to allow the patentee to recapture through equivalence

certain coverage given up during prosecution. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870, 228 USPQ 90, 96 (Fed.Cir.1985).

888, 901–02, 221 USPQ 669, 679 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856. That formulation, however, does not mean one can ignore claim limitations. As this court recently stated in *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 3 USPQ2d 1321 (Fed.Cir.1987):

> One must start with the claim, and though a "non-pioneer" invention may be entitled to some range of equivalents, a court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.... Though the doctrine of equivalents is designed to do equity, and to relieve an inventor from a semantic strait jacket when equity requires, it is not designed to permit wholesale redrafting of a claim to cover non-equivalent devices, i.e., to permit a claim expansion that would encompass more than an insubstantial change. (Citations omitted.)

> ... [I]n applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim.... "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Lemelson v. United States,* 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985) (footnote omitted). To be a "substantial equivalent," the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.

*Id.* at 1532–33, 3 USPQ2d at 1324–25.

■ Pennwalt argues that the "accused machines simply do in a computer what the patent *illustrates* doing with hard-wired circuitry," and asserts that "this alone is insufficient to escape infringement," citing *Decca Ltd. v. United States,* 544 F.2d 1070, 1080–81, 210 Ct.Cl. 546, 563–64, 191 USPQ 439, 447 (1976). If Pennwalt was correct that the accused devices differ only in substituting a computer for hard-wired circuitry, it might have a stronger position for arguing that the accused devices infringe the claims. The claim limitations, however, require the performance of certain specified functions. Theoretically, a microprocessor could be programmed to perform those functions. However, the district court found that the microprocessor in the accused devices was not so programmed.

After a full trial, the district court made findings that certain functions of the claimed inventions were "missing" from the accused devices and those which were performed were "substantially different." *Pennwalt,* 225 USPQ at 572. The district court observed that "because the 'Microsizer' uses different elements and different operations (on the elements it does use) than the elements and operations disclosed in the patent-in-suit to achieve the desired results, infringement can only be found if the different elements and operations are the legal equivalents of those disclosed in the patent-in-suit." *Id.* It is clear from this that the district court correctly relied on an element-by-element comparison to conclude that there was no infringement under the doctrine of equivalents, because the accused devices did not perform substantially the same functions as the Pennwalt invention. For example, the district court found in part:

> The machine described in the patent-in-suit uses shift registers that respond to "clock pulses" in order to indicate the various positions of the items to be sorted before each item is discharged. The "Microsizer" does not have any "indicating means" to determine positions of the items to be sorted since the microprocessor stores weight and color data, not the positions of the items to be sorted. After a piece of fruit has been analyzed by the "Microsorter" and while it is in transit from the optical detection means to the weight scale, the color value determined by the "Microsorter" is sorted in a color value queue. A color value queue pointer (which changes in value) points to

the location of the data corresponding to the next piece of fruit to reach the weight scale. A weight value queue pointer (which also changes in value) is used to correspond to the number of cups between the weight scale and the drop location. The microprocessor software utilizes a random access memory that stores the digital numbers which resulted from the conversion of the analog signals generated by the "Microsorter" and the weight scale, and the queue pointers (under clock control) point to the memory location that has the data about a piece of fruit. The data is never "shifted" around, but rather is just stored in memory until the software routines call for data to be utilized in subsequent portions of the program(s). Thus, the "Microsizer" has neither a "first position indicating means" nor a "second position indicating means." The machine described in the patent-in-suit produces signals that indicate where the fruit is, i.e. track the progression of each cup. The "Microsizer" does not.

*Id.* at 569.

Pennwalt argues that the district court erred as a matter of law in interpreting the claims which led to these findings. Pennwalt asserts that the district court looked to the specification and compared the accused devices with the preferred embodiment. As indicated, under the section 112, paragraph 6, analysis, such comparison was entirely correct, but it is readily apparent that the court did not so limit its infringement analysis. The court also looked for equivalent *functions.*

It is not the province of this court to determine *de novo* what is the preponderance of the evidence underlying the ultimate finding of no infringement or the subsidiary facts supporting that finding. Indeed, Fed.R.Civ.P. 52(a) prohibits our undertaking the role of the fact finder, which is the domain of the trial court. *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Graver Tank,* 339 U.S. at 611, 70 S.Ct. at 857. As stated in *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92

L.Ed. 746 (1948): "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

Here, if the district court was not clearly erroneous in finding that even a single function required by a claim or an equivalent function is not performed by the Durand-Wayland sorters, the court's finding of no infringement must be upheld. *Perkin-Elmer v. Westinghouse,* 822 F.2d at 1531, 3 USPQ2d at 1323.

Pennwalt asks us to reweigh the testimony, urging that the testimony of the court-appointed expert, Dr. Vacroux, is so strongly supportive of the contrary finding of infringement under the doctrine of equivalents that the district court's finding of no infringement cannot stand. Pennwalt, however, misconstrues the effect of Dr. Vacroux's testimony. Dr. Vacroux was a technical, not a legal, expert. He was not expected to, and did not, analyze infringement under a legal standard. He was not concerned, for example, with the scope of equivalents to which the claims were entitled in view of the prosecution history. In this light, the reports and testimony of Dr. Vacroux fully support the district court's finding of no infringement, rather than Pennwalt's position.

Pennwalt relies on the conclusory statement in Dr. Vacroux's initial written report in which he characterized the accused devices as "functionally equivalent" to the "invention." However, Dr. Vacroux also stated therein that "the new designs could be totally equivalent to those they replaced, *although the components and methods* used *differed significantly.*" (Emphasis added.) Further, when Dr. Vacroux was called to testify, and, in response to detailed questioning by the court, Dr. Vacroux testified that the accused devices performed *"some"* of the same type of operations but "in a different way" from the claimed invention. Specifically, Dr. Vacroux answered a question by the court as follows:

Dr. Vacroux: They [the accused and claimed devices] are not equivalent, but functionally the internal operations I would say internally are functionally equivalent because they perform *some of the same type of operations.* They compare, they shift, they add so we do have the same type of functions internally *but done in a different way.* [Emphasis added.]

Dr. Vacroux's statement that the accused devices performed only "some of the same type of operations" supports the court's finding that some were not. It does not conflict with any of his other testimony or with his written report. Thus, on the issue of whether the accused devices performed *each* of the functional limitations of the claim or its equivalent and, thus, operated in substantially the same way, the district court followed its expert precisely. The court cannot be faulted for finding no infringement where the expert's testimony as to facts negates a finding of equivalency under the correct legal standard. *See Perkin-Elmer v. Westinghouse*, 822 F.2d at 1531–32, 3 USPQ2d at 1323–24.

With respect to the scope of equivalent functions, the court correctly limited the claims, based upon review of the prosecution history, stating that "the claims of the patent should be read in light of the careful phraseology [of functions] chosen by the inventors" because "the machine disclosed in the patent-in-suit was carefully described so that it did not read on the prior art." *Pennwalt*, 225 USPQ at 570. As the court correctly noted, the invention was not a pioneer, but an improvement in a crowded art. The claims are "broad" with respect to what type of product can be sorted, i.e., "items" and, thus, sorters of all types of "items" fall within the relevant prior art. The claims are *narrow,* however, with respect to how the claimed sorter operates. Originally, the claims contained no position indicating means element with its associated functional limitations. The addition of that element was crucial to patentability. A device that does not satisfy this limitation at least equivalently does not function in . substantially the same way as the claimed invention. *Perkin-Elmer v. West-*

*inghouse,* 822 F.2d at 1532, 3 USPQ2d at 1324; *Chemical Eng'g Corp. v. Essef Indus., Inc.*, 795 F.2d 1565, 1572–73, 230 USPQ 385, 390–91 (Fed.Cir.1986).

The trial court found that the accused devices do not have any position indicating means to determine *positions* of the items to be sorted. Specifically with respect to claims 10 and 18, the court correctly held that "the microprocessor stores weight and color data, not the positions of the items to be sorted." *Pennwalt*, 225 USPQ at 569. Since each of the claims-at-issue requires a position indicating means and the same analysis applies to each, we set forth only the relevant language of claim 10:

*first position indicating means* responsive to a signal from said clock means and said signal from said second comparison means for continuously indicating the position of an item to be sorted while the item is in transit between said optical detection means and said electronic weighing means,

*second position indicating means* responsive to the signal from said clock means, the signal from said first comparison means and said first position indicating means for generating a signal continuously indicative of the position of an item to be sorted after said item has been weighed.

The testimony of Dr. Alford, Durand-Wayland's expert, was that the accused machine had no component which satisfied either of the above limitations defining position indicating means, and Pennwalt has admitted that the accused machines do not sort by keeping track of the physical location of an item in transit, continuously or otherwise, as required by each of these limitations.

Pennwalt argues that there is a way to find out where an item is physically located on the track in the accused machine. Its witness, Dr. Moore, testified *"you could find* the location of a particular fruit as it moves from the scale to the drop by counting the distance from the stored value for that fruit back to the place the pointer is indicating at the start of the queue." (Em-

phasis added.) Dr. Alford, Durand-Wayland's expert, admitted this was *possible*. Thus, Pennwalt asserts that the accused devices have "position indicating means."

One need not explain the technology to understand the inadequacy of Dr. Moore's testimony. As Dr. Moore himself indicates, the accused machine simply *does not do* what he explains "could" be done. It is admitted that the physical tracking of fruit is not part of the way in which the Durand-Wayland sorter works, in contrast to the claimed sorter which requires some means for "continuously indicating the position of an item to be sorted." While a microprocessor theoretically could be programmed to perform that function, the evidence led the court to a finding that the Durand-Wayland machines performed a *substantially different* function from that which each of the claims requires.

With respect to the other limitations of claim 10, Pennwalt admits that the asserted "position indicating means" of Durand-Wayland does not meet the limitation that the means must be "responsive to ... said signal from said second comparison means" because no comparison is made on the Durand-Wayland machine before the discharge point. However, Pennwalt contends that Durand-Wayland "has merely changed the position of an operable element, but the operation and results achieved are the same as those claimed." Pennwalt's analysis is flawed in significant respects.

First, the claim requires that the "position indicating means" must be responsive to certain specified signals. Thus, finding some combination of components in the accused device that might also be *labeled* a "position indicating means" is a meaningless exercise when such combination is not responsive to the specified signal. *See Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1570, 229 USPQ 561, 572 (Fed. Cir.1986) (argument "based on truncation of the claim language" rejected). As stated in *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1576, 1 USPQ2d 1593, 1603, (Fed.Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987):

In interpreting the claims, the district court committed fundamental legal error when it analyzed each by a single word description of one part of the claimed tie. In patent law, a word ("teeth"; "hinge"; "ledge") means nothing outside the claim and the description in the specification. A disregard of claim limitations, as here, would render claim examination in the PTO meaningless. If, without basis in the record, courts may so rewrite claims, the entire statutory-regulatory structure that governs the drafting, submission, examination, allowance, and enforceability of claims would crumble.

Second, the district court correctly rejected Pennwalt's assertion that the memory component of the Durand-Wayland sorter which stores information as to weight and color of an item performed substantially the same functions as claimed for the position indicating means. The district court found that a memory function is not the same or substantially the same as the function of "continuously indicating" where an item is physically located in a sorter. On this point the record is indisputable that before the words "continuously indicating" were added as an additional limitation, the claim was unpatentable in view of *prior art* which, like the accused machines, stores the information with respect to sorting criteria in memories, but did not "continuously" track the location. *See, e.g.,* U.S. Patent No. 3,289,832 issued to Ramsey.

Thus, the facts here do not involve later-developed computer technology which should be deemed within the scope of the claims to avoid the pirating of an invention. On the contrary, the inventors could not obtain a patent with claims in which the functions were described more broadly. Having secured claims only by including very specific *functional* limitations, Pennwalt now seeks to avoid those very limitations under the doctrine of equivalents. This it cannot do. *Graham v. John Deere Co.*, 383 U.S. 1, 33–34, 86 S.Ct. 684, 701–02, 15 L.Ed.2d 545 (1965); *Chemical Eng'g Corp.*, 795 F.2d at 1572 n. 8, 230 USPQ at 391 n. 8; *see also Exhibit Supply Co. v.*

*Ace Patents Corp.,* 315 U.S. 126, 136, 62 S.Ct. 513, 518, 86 L.Ed. 736 (1942); *Coleco Indus., Inc. v. United States Int'l Trade Comm'n,* 573 F.2d 1247, 1257–58, 65 C.C.P. A. 105, 116–17, 197 USPQ 472, 479–80 (1978). Simply put, the memory components of the Durand-Wayland sorter were not programmed to perform the same or an equivalent function of physically tracking the items to be sorted from the scanner to the scale or from the scale to its appropriate discharge point as required by the claims.[2]

Contrary to Pennwalt's arguments, the district court did not disregard the need to consider a range of equivalent *functions* under the doctrine of equivalents. Rather, upon evaluation of the evidence, the court concluded, as a fact, that no component in the Durand-Wayland devices performed a function within the permissible range of equivalents for the function of the first position indicating means. That function is required by all of the claims-at-issue. No means in the accused devices performs that function and thus there could be no literal infringement. No means with an equivalent function was substituted in the accused devices and thus there can be no infringement under the doctrine of equivalents. The district court's finding of no infringement is not clearly erroneous.

### Attorney Fees

Durand-Wayland has not shown that the district court's refusal to find the case exceptional and award it attorney fees was based on clearly erroneous findings. *Reactive Metals & Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1582–83, 226 USPQ 821, 824 (Fed.Cir.1985).

### CONCLUSION

We affirm the judgment based on the finding of no infringement, the award of costs, and the denial of attorney fees to Durand-Wayland. There being no indication that Durand-Wayland's cross-appeal on validity extends beyond the litigated claims or the accused devices found to be noninfringing, we dismiss the cross-appeal as moot and vacate that part of the judgment concerning the validity of Pennwalt's patent.

AFFIRMED–IN–PART AND VACATED–IN–PART.

BENNETT, Senior Circuit Judge, dissenting in part, with whom COWEN, Senior Circuit Judge, and EDWARD S. SMITH and PAULINE NEWMAN, Circuit Judges, join.

I agree with the majority that the district court's finding of no literal infringement of the '628 patent claims has not been shown to be clearly erroneous. However, I believe that the district court failed to consider the doctrine of equivalents issue in accord with the precedents of both this court and the Supreme Court. The in banc majority in this case, in affirming the district court, does not follow the precedents of this court. While the court sitting or hearing a case in banc can overrule its prior decisions, *see Capital Elec. Co. v. United States,* 729 F.2d 743, 746 (Fed.Cir.1984), it must do so openly and affirmatively, not sub silentio. The majority apparently, curiously, prefers not to acknowledge expressly the significant number of our prior decisions being overruled by its opinion. Therefore, I respectfully dissent from the majority's discussion of and conclusion on the issue of infringement under the doctrine of equivalents.

The majority opinion contravenes Supreme Court precedents, which do not leave the majority free to rewrite the doctrine of equivalents without regard for stare decisis principles. In so doing, the majority has made shortsighted policy choices. The ma-

---

**2.** That a patent applicant narrows his claim to secure a patent does not always mean that prosecution history estoppel completely prohibits the patentee from recapturing some of what was originally claimed. The amount of coverage retained depends on the circumstances of each case. *See, e.g., Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 870, 228 USPQ 90, 96 (Fed.Cir. 1985); *Bayer Aktienegesellschaft v. Duphar Int'l Research,* 738 F.2d 1237, 1243, 222 USPQ 649, 653 (Fed.Cir.1984); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362, 219 USPQ 473, 481 (Fed.Cir.1983).

jority has contrived an analytical framework for the doctrine of equivalents that is little more than a redundant literal infringement inquiry, which renders the doctrine of equivalents so unduly restrictive and inflexible as to end its usefulness as judicial doctrine. As this court is confronted in the future with different factual settings in the varied and increasingly complex technologies that comprise this court's patent cases, the court will be forced to admit (or ignore) the full extent of the ties with which it has bound itself today.

The majority facially retains the historical test set forth in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950), for infringement under the doctrine of equivalents by stating that infringement in such instances may be found if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention.[1] *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856, 85 USPQ at 330. But in practical effect, the majority has eviscerated the underlying rationale of the *Graver Tank* test by requiring, under the doctrine of equivalents, an exact equivalent for each element of the claimed invention. The majority in fact commends the district court for undertaking the proper doctrine of equivalents determination, which the majority describes as an element-by-element comparison of the accused device and the patent-in-suit. However, the purported "element-by-element comparison" was never the extent of the doctrine of equivalents analysis under our here-ignored precedents which also required that the analysis be undertaken in light of the entirety of the accused device and entirety of the patent-in-suit. *See, e.g., Martin v. Barber*, 755 F.2d 1564, 1568, 225 USPQ 233, 235 (Fed. Cir.1985); *Carman Indus., Inc. v. Wahl*, 724 F.2d 932, 942, 220 USPQ 481, 488–89 (Fed.Cir.1983); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 219 USPQ 473 (Fed.Cir.1983).

Even the district court in this case recognized that our precedents require more. Unlike the limited analysis attributed to it by the majority, once the district court determined that all the elements in the patent-in-suit or equivalents of those elements (as determined under 35 U.S.C. § 112–6) were not present in the accused device, it attempted to go beyond the element-by-element comparison to determine whether the "different elements and operations" used in the accused device were "the legal equivalents of those disclosed in the patent-in-suit."[2] 225 USPQ at 572. Although in my opinion the district court did not completely understand the significance of the requirement to view the "claimed invention as a whole" and therefore erred in making the proper inquiry, the district court nevertheless was attempting to comply with our precedents that undeniably required application of the doctrine of equivalents to the invention as a whole. *Hughes*, 717 F.2d at 1364, 219 USPQ at 482. This required the fact finder to decide by viewing the accused device as a whole whether it and the claimed invention operate in substantially the same way and have substantially the same function and result as the claimed invention. *Martin*, 755 F.2d at 1568, 225 USPQ at 235.[3]

---

1. The Supreme Court in *Graver Tank* recognized that infringement under the doctrine of equivalents is "ready and available for utilization when the proper circumstances for its application arise." 339 U.S. at 608, 70 S.Ct. at 856, 85 USPQ at 330. However, when the basic test is invoked and the proper circumstances proven by a patentee, a finding of infringement is not discretionary. *Cf.* Harris, *Ambiguities of the Doctrine of Equivalents in the Federal Circuit*, 69 J.Pat. & Trademark Off.Soc'y 91, 92 n. 4 (1987).

2. Surprisingly, this is the exact sentence from the district court's opinion which the majority quotes to illustrate the district court's purported adherence to an element-by-element analysis. If the analysis announced by the majority here had been followed by the district court, the district court would not have needed to go beyond its determination that the accused device employed different elements and different operations on those different elements in order to support its finding of no infringement.

3. Here, there is no dispute that the two devices at issue perform the same overall function and achieve the same overall result. Thus, the relevant inquiry, as it is in nearly all doctrine of equivalents analyses, is whether the accused device and the claimed invention perform the

The majority's departure from our recent precedents is illustrated by an examination of *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 219 USPQ 473 (Fed.Cir. 1983), which is clearly being overruled by the majority, despite not even being mentioned in its opinion. In *Hughes*, this court squarely addressed the issue of infringement under the doctrine of equivalents of claims containing means-plus-function limitations. The invention in *Hughes* was an "apparatus" (a space satellite) and the representative claim contained multiple limitations, some of which were written in means-plus-function form, including (1) means for providing an indication of the spin angle to a location *external* to the satellite; (2) means for receiving control signals from the *external* source; and (3) means for applying fluid to a fluid expulsion means within a fixed time period after the receipt of a control signal *from the external location*. *Id.* at 1364, 219 USPQ at 483. The alleged infringing spacecraft replaced the three above-enumerated steps with an on-board computer which did not transmit the data to an external source, receive a control signal from that external source, or respond to the received signal as expressly required by the claim limitations.

The *Hughes* trial court had treated the subject of equivalency in its finding:

> There is no obvious or exact equivalent of plaintiff's means for providing an indication of the ISA to an external location in either of the SKYNET II, NATO II or DSCS II systems. Nor is there an obvious or exact equivalent of the means for pulsing the precession jet within a fixed time period after the receipt of a control signal in any of the accused store and execute systems.

*Id.* at 1363, 219 USPQ at 482 (quoting district court opinion). This court, in reversing the trial judge, concluded that:

same overall function to achieve the same overall result *in substantially the same way.*

4. Relying on three cases from the Court of Claims, *Hughes* made clear that "partial variation in technique, an embellishment made possible by [post-patent] technology, does not allow the accused spacecraft to escape the 'web of infringement.'" *Id.* at 1365, 219 USPQ at 483

However the phrase "obvious and exact equivalents" may be defined, it was effectively and improperly applied here as a substitute for literal infringement, the absence of which was conceded. *The failure to apply the doctrine of equivalents to the claimed invention as a whole, and the accompanying demand for "obvious and exact" equivalents of two elements the presence of which would have effectively produced literal infringement, was error.*

*Id.* at 1364, 219 USPQ at 482 (emphasis added).

The *Hughes* decision held that the accused spacecraft with the position computed and retained on-board was the equivalent of the claimed satellite with its position calculated on the ground since the devices performed substantially the same function in substantially the same way to reach the same result, and that this conclusion was not estopped by the prior art or prosecution history. This conclusion was reached in full recognition of the failure of the accused spacecraft to meet separately three limitations of the claims-in-issue. *Hughes* stated:

> That argument is clearly effective against an allegation of literal infringement, for if the ... spacecraft *did* send an ISA position to the ground, literal infringement of that element of the claims would be clear. Williams controls his satellite, and the government controls its S/E spacecraft, from the ground. That Williams does so in "real time" and the government does so in a delayed reaction made possible by the advent of computers does not establish that the S/E spacecraft do not perform the same function in substantially the same way to obtain the same result.

*Id.* at 1365, 219 USPQ at 483 (emphasis in original).[4]

(citations omitted). However, in this case, both Pennwalt and Durand agreed that microprocessor technology existed at the time of the February 1976 application for the '628 patent, although those available were considerably less powerful and more costly than those available around 1980. 225 USPQ at 570. It is clear that an equivalent can be found in technology

Despite any protestations to the contrary, it should be beyond dispute that infringement could not have been found in *Hughes* under the analysis announced by the majority today. In fact, the majority's current analysis under the doctrine of equivalents amounts to nothing more than the search for "obvious and exact equivalents" that this court denounced in *Hughes.* This is aptly illustrated by the majority's reliance on the Durand microprocessor not being programmed to perform each of the functions required by the claim limitations, even though it was theoretically possible to so program the microprocessor, as grounds for affirmance of the finding of no infringement under the doctrine of equivalents.

Although the majority asserts Pennwalt's case might be stronger if the accused devices only substituted a computer for hard-wired circuitry, the district court found that "the machine described in the patent-in-suit and the 'Microsizer' are virtually identical *except* for the control system that conducts the sorting operation." 225 USPQ at 569 (emphasis in original). The majority does not criticize that finding. Furthermore, the district court's finding that the Microsizer performed different functions than the patent-in-suit was solely part of the district court's analysis leading to its finding that there was no literal infringement, *id.*, and can be characterized as nothing more than a recognition of the inherent differences in hard-wired circuitry and microprocessors. If, as under the district court's and the majority's analyses, the use of software and a computer or microprocessor to perform the function of hard-wired circuitry is enough to find that

a device employing a microprocessor performs different functions and operations, then no device that employs computers or microprocessors could ever under the doctrine of equivalents infringe a prior patent on a device that employs hard-wired circuitry. The extent of the doctrine of equivalents inquiry cannot be confined, as it was by the district court and the majority, to the mere change to the use of a computer or microprocessor.

As stated by the Supreme Court in *Graver Tank*, 339 U.S. at 609, 70 S.Ct. at 856, 85 USPQ at 331, it is important to know whether those "reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was," *see infra*, but the district court added an erroneous criterion: whether those with ordinary skill in the art would know *how* to substitute them. *Pennwalt*, 225 USPQ at 572. In my opinion, the district court misconstrued the inquiry. If the inquiry is to determine whether one item can be substituted for another, and those skilled in the art know that it can, then the actual interchangeability of the two items is not affected by whether those same persons could, without further study, substitute them. *See Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*, 750 F.2d 1569, 1580, 224 USPQ 409, 416–17 (Fed.Cir.1984); *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 82, 213 Ct.Cl. 395, 420, 193 USPQ 449, 461 (1977).[5]

The literal infringement inquiry involving section 112–6 and the infringement inquiry under the doctrine of equivalents are distinct, even when limitations written in

known at the time of the invention, as well as in subsequently developed technology. *See, e.g., Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.,* 750 F.2d 1569, 1581, 224 USPQ 409, 417 (Fed.Cir.1984).

5. This distinction strikes me as being especially important where computers and/or multidiscipline inventions are involved. *Cf. In re Naquin,* 398 F.2d 863, 866, 55 C.C.P.A. 1428, 1431, 158 USPQ 317, 319 (1968) (specification is enabling when it allows the adepts of each art involved in the invention to carry out the aspect proper to their specialty). The court's new standard improperly requires the person of average skill in

the art not only to have the knowledge that microprocessors could be interchanged with the electronics of the hard-wired sorting machines, but also to know *how* the computer's components and logic actually work and function and *how* to substitute them. Such a general rule is inappropriate to a doctrine of equivalents analysis, which requires sufficient flexibility to consider the extent and complexity of the modification, in order to reach a just result on the facts of each case and to avoid "a fraud on [the] patent." *See Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856, 85 USPQ at 330.

means-plus-function language are present, and must be made separately when, as in the present case, each is properly at issue. The majority apparently agrees that the two infringement analyses should be distinct, but nevertheless completely blurs, if not eliminates, the distinctions between them. For, if section 112–6 "plays no role in determining whether an equivalent function is performed by the accused device under the doctrine of equivalents," it is curious that the majority relies on a lengthy quote from the district court's discussion of why the accused device does not literally infringe the patent-in-suit to illustrate why the district court's element-by-element literal infringement comparison yielded no equivalent for the position indicating means.

Thus, while the majority's subsequent discussion does indeed support its conclusion that the district court's finding of no literal infringement was correct, it is completely inappropriate as part of the infringement analysis under the doctrine of equivalents. The enactment of section 112–6 did not eliminate the applicability of the doctrine of equivalents in situations where there are means-plus-function claims involved. The majority nevertheless abandons the additional and separate equivalence analysis heretofore necessary, and fails to require the district court properly to determine if the accused device contained an equivalent of the position indicating means under the doctrine of equivalents, after having viewed the claimed invention and the accused device as a whole.

Furthermore, the court-appointed expert's testimony does not support either the majority's conclusions or its analysis. In fact, the majority should have declined the invitation to reweigh the testimony and certainly should not have taken the additional step of recasting the court-appointed expert's testimony to support its position since the job of evaluating the testimony of expert witnesses and witnesses in general is peculiarly that of the trier of fact. *See, e.g., Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982); *Gould v. Quigg,* 822 F.2d 1074, 1077–78, 3 USPQ2d 1302, 1304

(Fed.Cir.1987). The district court described Dr. Vacroux's testimony as "unbiased, well-qualified and scholarly," but nevertheless declined to adopt it. 225 USPQ at 572. As the majority points out, Dr. Vacroux was a technical, not legal, expert and he did not analyze the infringement issue under a legal standard. Yet, despite the district court's rejection of testimony which was not directed toward the legal issues in the case, the majority curiously determines that the same testimony fully supports its finding of no infringement. Thus, it would appear that the district court was operating under a different view of what was needed for infringement under the doctrine and that the expert's testimony must not have supported a finding of noninfringement under what the district court perceived the legal standard to be prior to this decision. Since Dr. Vacroux's testimony was, at best, adequate to support a finding of no literal infringement, but completely inconclusive on the issue of infringement under the doctrine of equivalents, I prefer the district court's decision not to adopt Dr. Vacroux's testimony to the majority's decision to recast it.

The majority goes on to conclude that Pennwalt is estopped by the prosecution history from gaining coverage under the doctrine of equivalents of that which it gave up through amendment of its claims during prosecution of the '628 patent. First, the majority holds that since the original claims were unpatentable without the "position indicating means" element, Pennwalt cannot now argue that "crucial" element is immaterial or deny that a device without that element does not function in substantially the same way as the claimed invention. However, in my view, the amendment to include the term "position indicating means" does not end the infringement inquiry here since both the accused device and the claimed invention "indicate position" in equivalent manners. The majority errs in interpreting the actual meaning of the term, as used by the patentee.

The district court held that "the microprocessor stores weight and color data, not

the positions of the items to be sorted." 225 USPQ at 569. The majority upholds this finding as not clearly erroneous and, to the limited extent of the finding, I agree. However, the conclusion that the accused device does not indicate position does not end the analysis because it is clear that the claimed invention, just like the accused device, does not store or directly indicate the position of the items to be sorted. In order to apply the claims, they must first "be construed 'in connection with the other parts of the patent instrument and with the circumstances surrounding the inception of the patent application.'" *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir.1983) (quoting *Autogiro Co. v. United States*, 181 Ct.Cl. 55, 62, 384 F.2d 391, 397, 155 USPQ 697, 702 (1967)).

The claimed invention of the '628 patent employs shift registers to shift sequentially weight and color data corresponding to a specific item from one memory register to an adjoining register as that item moves along the conveyor belt. The data is placed and shifted across shift registers containing the same number of registers as there are conveyor locations between one detection means (for weight or color) and either the next detection means or the discharge point. Thus, the shifted data in the claimed invention represents weight and color data, not position, and could only be used to indicate position in the literal sense by physically counting where in the shift register is the data for a given item. Just as in the accused device, although it could be done, it is not.

Both devices do, however, continually store the data corresponding to a particular item until it has reached the proper drop location corresponding to its color and weight characteristics. The claimed invention does this through the use of shift registers as described above while the accused device stores the data in a queue and uses pointers which move synchronously with the movement of the conveyor cups. The real question to be answered here, one which the district court and the majority never reached, is whether the queues and pointers perform in substantially the same

way the functions of the claimed position indicating means when the latter are interpreted in light of the specification. The majority also holds that since Pennwalt added the limitation "continuously indicating" to the claims containing the position indicating means element, it cannot use the doctrine of equivalents to avoid that limitation. But whether the patent claims were amended by adding "continuously indicating" in order to distinguish from the noncontinuous methods employed in prior art, such as the Ramsey patent, is not relevant here since the Durand device also performs continuously the "position indicating" function.

Finally, the majority's treatment of the limitation that the first position indicating means be "responsive to ... said signal from said second comparison means" is the clearest illustration of the shortcomings of the majority's approach to the doctrine of equivalents. Pennwalt concedes that the Durand devices do not literally infringe claims 10 and 18 because that limitation is not literally met. In the claimed invention, the color grade from the color head is compared to the reference values and converted into data form, which then is stored directly in the first position indicating means while the item is in transit to the weight scale. In the Durand device, the color grade is stored directly and is not compared to the reference values until the item has reached the weight scale.

The majority rejected as significantly flawed Pennwalt's assertion that Durand's mere change of the position of an operable element was not enough to avoid infringement under the doctrine of equivalents. However, the only apparent flaw noted by the majority is that the claim requires that the position indicating means be responsive to certain signals and that without being responsive to the specified signal, any other combination of elements cannot be deemed to contain an equivalent of the functional limitations describing the position indicating means. In my view, a comparison to the color reference values occurring in the Durand device after the item reaches the weight scale is an equivalent

function whether or not its first position indicating means is responsive to a signal from a comparison means, when the accused device is viewed in its entirety and compared to the claimed invention as a whole. To preclude the possibility of finding equivalent functions and therefore preclude finding infringement under the doctrine of equivalents simply because the accused device does not perform its functions in the same order as the claimed invention reduces the doctrine of equivalents, in practical effect, to nothing more than the test for literal infringement.

As discussed above, the majority is overruling this court's recent teachings that require consideration of the claimed invention as a whole when making the doctrine of equivalents analysis. The overruling of our precedents is, of course, permissible since the court sua sponte sits in banc. However, even when sitting in banc, this court can only overrule its own prior decisions, not those of the Supreme Court. I believe that the majority's opinion departs significantly from the clear teachings of the Supreme Court, specifically those in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950), and, in fact, adopts the position and the spirit of the dissenting opinions rejected in *Graver Tank*.

In *Graver Tank*, the patent claims at issue involved an electrical welding process containing a combination of an alkaline earth metal silicate and any other silicate. The patented composition actually used silicates of calcium and magnesium, which were both alkaline earth metal silicates. The accused composition used silicates of calcium and manganese, the latter not being an alkaline earth metal. That difference prevented the finding of literal infringement. Nevertheless, the Supreme Court noted that the two compositions used the same mechanical methods, were identical in operation, and produced the same kind and quality of weld.

The key issue became whether the substitution of a nonalkaline earth metal (manganese) for the alkaline earth metal (magnesium) claimed in the patent was, under the circumstances of the case and in view of the prior art and the technology involved, a sufficiently insubstantial change which justified application of the doctrine of equivalents. The Supreme Court concluded, despite the claim language, that the use of manganese was an insubstantial change. In fact, the Court found infringement under the doctrine of equivalents despite several prior art patents which disclosed the use of manganese in welding fluxes, and despite the patent specification itself indicating that the patentee had experimented with using manganese in its fluxes.

The current case presents, as did *Graver Tank* and as does any case involving the doctrine of equivalents, a choice between conflicting policies. On the one hand, there is the historic right of affording the public fair notice of what the patentee regards as his claimed invention in order to allow competitors to avoid actions which infringe the patent and to permit "designing around" the patent. *See, e.g., State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236, 224 USPQ 418, 424 (Fed.Cir.1985). On the other hand, equally important to the statutory purpose of encouraging progress in the useful arts, is the policy of affording the patent owner complete and fair protection of what was invented.

The resulting tension between the competing policies has been long recognized and the inability to reconcile fully the two views has long been accepted by the courts. In *Royal Typewriter Co. v. Remington Rand, Inc.*, 168 F.2d 691, 692, 77 USPQ 517, 518 (2d Cir.1948), Judge Learned Hand elaborated:

[A] patent is like any other legal instrument; but it is peculiar in this, that after all aids to interpretation have been exhausted, and the scope of the claims has been enlarged as far as the words can be stretched, on proper occasions courts make them cover more than their meaning will bear. If they applied the law with inexorable rigidity, they would never do this.... [But] at times they resort to the "doctrine of equivalents" to tem-

per unsparing logic and prevent an infringer from stealing the benefit of the invention. No doubt, this is, strictly speaking an anomaly; but it is one which courts have frankly faced and accepted almost from the beginning (footnote omitted). All patents are entitled to its benefit to an extent, measured on the one hand by their contribution to the art, and on the other by the degree to which it is necessary to depart from the meaning to reach a just result.[6]

The same principles were stated by this court in *Thomas & Betts Corp. v. Litton Sys., Inc.,* 720 F.2d 1572, 1579, 220 USPQ 1, 6 (Fed.Cir.1983):

> If a patentee were bound by the literal language of his specification and claims, the purpose of the doctrine of equivalents, to give relief against the copier who merely makes insubstantial substitutions in a claimed invention, would be frustrated. Thus, the proposition that the claims, taken in view of the specification, measure the metes and bounds of the invention has been realistically tempered by the judicially-formulated doctrine of equivalents.[7]

The equitable doctrine of equivalents has existed since *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853), and "has been consistently applied by [the Supreme Court] and the lower federal courts ... when the proper circumstances for its application arise." *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856, 85 USPQ at 330. In these more than 130 years of jurisprudence there have indeed arisen instances of judicial interpretation of claims beyond their literal boundaries, in the interest of justice. The view that such judicial flexibility should not exist is contrary to these decades of decisions, and appears to be contrary to that good judgment which underlies our precedents.

To preserve to the district courts the ability to apply the long-standing equitable doctrine of equivalents in infringement suits that merit such equity does not pose a threat to the statutory role of claims.[8] Even when the doctrine of equivalents is invoked, the claims set forth that against which the equivalency is tested. To require a one-to-one correspondence creates a bright line rule easier to apply, but costly in terms of unfair results in exceptional cases. Such inequity has been rejected by the Supreme Court and, up until today, by our own precedents. The slight gain in predictability resulting from the majority's opinion will be greatly outweighed by the loss resulting from the inability to remedy inequities resulting from insubstantial changes to and substitutions in patent claims, as the Court recognized in *Graver Tank.*

Had the majority in this case been confronted with the facts of *Graver Tank,* it is doubtful that it would have ever looked beyond the claim limitation specifically requiring an alkaline earth metal. Yet the Court's discussion and analysis in *Graver Tank* illustrates both the shortsightedness

**6.** Judge Hand's observations and his actual language regarding the tempering of unsparing logic to prevent an infringer from stealing the benefit of an invention were later adopted by the Supreme Court in *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856, 85 USPQ at 330.

**7.** *See also* 4 D. Chisum, *Patents* § 18.04[1], at 18–32.3 ("While contrary to the general principle that the claims measure the scope of the patent monopoly, the doctrine is retained in order to prevent persons from practicing fraud on patents.").

**8.** *See Graver Tank,* 339 U.S. at 607, 70 S.Ct. at 855, 85 USPQ at 330 ("In determining whether an accused device or composition infringes a valid patent, resort must be had *in the first instance* to the words of the claim." (Emphasis added.)). *Compare Paper Converting Machine Co. v. Magna–Graphics Corp.,* 745 F.2d 11, 19, 223 USPQ 591, 596 (Fed.Cir.1984), where this court stated the following:

> [That] argument is based on the utopian belief that a copier "should be able to look to the patent claims and know whether his [or her] activity infringes or not. Although this may be a desirable goal for the patent laws, it is *not* the law as it exists. In particular, the doctrine of equivalents has been judicially created to ensure that a patentee can receive full protection for his or her patented ideas by making it difficult for a copier to maneuver around a patent's claims. In view of this doctrine, a copier never knows whether his product "infringes" a patent or not until a district court passes on the issue. (Emphasis in original.)

of the policy choices and the shortcomings in the analysis adopted by this majority in the current opinion.

[C]ourts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law.... Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent.

339 U.S. at 607–08, 70 S.Ct. at 856, 85 USPQ at 330.

Literal differences between the claimed and accused devices should always exist before the issue of infringement under the doctrine is reached. The majority's holding in this case that the making of the color grade comparisons after the item reaches the weight scale in the Durand device is enough to avoid infringement under the doctrine is nothing more than a conclusion that "any unimportant and insubstantial changes and substitutions" which take the accused device "outside the claim" are also sufficient to show that the accused device does not function in substantially the same way as the claimed invention. Thus, the same features which defeat the possibility of literal infringement are now being used to preclude possible application of the doctrine of equivalents. Up until now, this court has rejected such a limited view of the doctrine. *See, e.g., Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 228 USPQ 90 (Fed.Cir.1985).[9] Furthermore, the Supreme Court made clear that the doctrine of equivalents was not to be so limited.

Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform.

*Graver Tank,* 339 U.S. at 609, 70 S.Ct. at 856, 85 USPQ at 330–31.

The application of the doctrine of equivalents to "the claimed invention as a whole" as expressed by this court in *Hughes,* 717 F.2d at 1364, 219 USPQ at 482, is inherent

---

**9.** The accused composition and the claims in *Loctite* were found to differ only in that the claimed composition could cure anaerobically at room temperature, whereas the accused composition cured anaerobically only after the addition of heat at 90°C. The district court concluded this difference required a finding that the compositions did not work in substantially the same way. The district court's approach was held to be incorrect as a matter of law. Although in *Loctite* only a single claim limitation was affected, the statement of law by *Loctite* retains its applicability in the present case. The court stated:

That finding [that the difference required a conclusion that the compositions do not work in substantially the same way] however, would allow the difference itself to dictate a finding of no equivalence, and if that were the law, one could never have infringement by equivalence. The analysis must go further, and the question the district court should consider on remand is this: given the difference, would the accused composition at 90°C. and the claimed invention at room temperature perform substantially the same function (*e.g.,* filling the pores of the treated material with solid material) in substantially the same way (*e.g.,* by rapidly curing in the absence but not in the presence of oxygen) to give substantially the same result (*e.g.,* a filled material). *Id.* at 870, 228 USPQ at 95–96.

in the policy expressed in *Graver Tank.* In order to determine equivalency in light of "the purpose for which an ingredient is used in a patent" and "the qualities it has when combined with the other ingredients" as mandated by the Supreme Court, it is indeed necessary to view the entire claim as a whole, and not merely to conduct an element by element comparison. It is only after such an analysis that the fact finder can determine, in light of the entire claim and all of its limitations, whether the changes or substitutions made alter substantially the way that the accused device works when compared to the claimed invention as a whole.

Thus, the proper inquiry was and should remain whether the devices considered *as a whole* satisfy the tripartite test of *Graver Tank.* That question has yet to be properly and completely considered by the trial court in this case. I would vacate the district court's decision of noninfringement under the doctrine of equivalents, and remand for a proper consideration of that question in light of the law set out in our prior precedents and this opinion. The question of infringement, whether literal or by equivalents, is a question of fact. *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1125, 227 USPQ 577, 589 (Fed.Cir. 1985). It is a question for the district court to decide while properly applying the applicable law. Because the district court's factual findings were made under a misapplication of the law of the doctrine of equivalents, remand for completion of the fact-findings relating to the issue of infringement under the doctrine is the only proper course of action. *See, e.g., Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982) (findings resting on an erroneous view of the law may be set aside on that basis).

## CONCLUSION

Justice in the administration of the patent law recognizes the tension between the statutory role of claims and the equitable doctrine of equivalents. Both the public interest and that of the inventors are best served when an equitable balance is struck, not as a matter of dominating policy, but as the facts require. In my view, the majority's adoption of a rigid element-by-element analysis for the doctrine of equivalents skews the balance well toward a slavish and formalistic adherence to the words of a claim to the detriment of both the patent owner and the public. Furthermore, the majority fails to acknowledge its departure from our precedents which require application of the doctrine of equivalents to the claimed invention as a whole, and the corresponding shift in its application of the doctrine of equivalents. If the failure to mention our contrary precedents was meant to signify the majority's view that no such departure or shift was intended, then I protest the ad hoc method of decision making employed by the majority. While infringement under the doctrine of equivalents is a factual decision to be decided under the facts and circumstances of each case, the parameters and boundaries of the doctrine can only be shaped and identified from examination and study of the prior decisions of the Supreme Court and this court in their varied factual settings. Ignorance of those prior decisions does not foster accomplishment of this court's mission of providing stability to the patent law.

Under the facts and circumstances of this case, I do not believe that Pennwalt is estopped by the addition of position indicating means to its claims during prosecution or by the addition of the limitation that such means indicate "continuously" the position of the item to be sorted. Nor do I believe that an alteration of the order in which certain functions are performed should automatically preclude application of the doctrine of equivalents. In short, I believe that, despite making a laudable effort to handle a developing area of the law, the district court made an abbreviated and incomplete analysis of the doctrine of equivalents issue and must therefore be given the opportunity to complete its analysis. Therefore, for all of the above reasons, I dissent from the majority's analysis and conclusion on the doctrine of equiva-

lents issue. I would remand the infringement issue to the district court.[10]

NIES, Circuit Judge, additional views.

No precedent is overruled or even modified by the majority opinion. I join the majority opinion in all respects and write only to add a review of that precedent.

It is axiomatic under our precedent that one cannot obtain patent protection for an inventive concept or for the heart or "essence" of an invention or for an achieved result. That basic principle cannot be avoided under the rubric of "protection of the invention as a whole." The statute requires that the inventor particularly point out and distinctly claim the subject matter of his invention. 35 U.S.C. § 112, second paragraph (112–2) (1982). A patent claim is not intended to be and cannot be only a general suggestion of an invention. The invention is defined by the limitations set out in the claim which thereby fix the scope of protection to which the patentee is entitled. The limitations defining the invention tell the public what it cannot make, use, or sell. Equally important, the limitations defining the invention tell the public what it can make, use, or sell without violating the patentee's rights.

The purpose of a claim has not changed since it was stated in *White v. Dunbar*, 119 U.S. 47, 52, 7 S.Ct. 72, 74–75, 30 L.Ed. 303 (1886), as follows:

The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.

It is also axiomatic that infringement requires that the claim "read on" the accused device. That means that the patent owner must show structure in the accused device that satisfies the limitations chosen by the inventor to define his invention. An infringement analysis, thus, requires that the courts look at *each* element of the claim, that is, proceed through the claim element-by-element, and look for correspondence in the allegedly infringing device.[1] If an accused device does not contain at least an equivalent for each limitation of the claim, there is no infringement because a required part of the claimed invention is *missing*. Indeed, this hoary principle has long been known as the "All Elements" rule. As stated in 4 D. Chisum, *Patents* § 18.03[4] (1986):

**[4]—The "All Elements" Rule**

Claims in patents are typically drafted in the form of a preamble, transition and one or more elements. Each element constitutes a limitation or narrowing of the scope of the claim. It follows that a claim will not cover or "read on" any device or process unless that device or process contains all the elements of the claim (or an equivalent thereof within the meaning of the doctrine of equivalents). This rule is frequently applied by the courts to so-called "combination" claims. However, the rule in fact is a universal one of claim drafting and construction. [Footnotes omitted.]

Thus, when an element is entirely *missing*, that is, when the accused device does not contain either the exact element of the claim *or* its equivalent, there is no infringement. Conversely, an element is not "missing" if an equivalent has been substituted.

Every Supreme Court decision which has addressed the issue of infringement of a patent claim, beginning with *Prouty v. Draper*, 41 U.S. (16 Pet.) 335, 10 L.Ed. 985 (1842)—and the precedent is voluminous—

---

**10.** Ordinarily, a remand on the issue of infringement would require this court to resolve the issues concerning validity raised on appeal. In light of the finding of no infringement by the majority and in view of the varied and potentially complex issues raised by the parties regarding validity, I also express no opinion on any of the validity issues. *Vieau v. Japax, Inc.*, 823 F.2d 1510, 1517–21, 3 USPQ2d 1094, 1100–03 (Fed.Cir.1987) (Bennett, S.J., concurring). I

concur in the affirmance of the denial of attorney fees to Durand–Wayland.

**1.** One-to-one correspondence is not required. Elements may be combined in some instances to achieve an equivalent element. *Machine Co. v. Murphy*, 97 U.S. (7 Otto) 120, 123, 24 L.Ed. 935 (1877).

has held that where a part of the claimed invention, that is, a limitation of the claim, is lacking in the accused device exactly or equivalently, there is no infringement.

In *Prouty* the Supreme Court explained: The patent is for a combination, and the improvement consists in arranging different portions of the plough.... [T]his combination, composed of all the parts mentioned in the specification, and arranged with reference to each other, and to other parts of the plough, in the manner therein described, is stated to be the improvement, and is the thing patented. The use of any two of these parts only, or of two combined with a third, which is substantially different, in form, or in the manner of its arrangement and connection with the others, is, therefore, not the thing patented.

41 U.S. (16 Pet) at 341. To the same effect are:

*Brooks v. Fiske*, 56 U.S. (15 How.) 211, 219, 14 L.Ed. 665 (1853): "To infringe, Norcross must use all the parts of Woodworth's combination."

*Vance v. Campbell*, 66 U.S. (1 Black) 427, 429, 17 L.Ed. 168 (1861): "[U]nless the combination is maintained, the whole of the invention fails. The combination is an entirety; if one of the elements is given up, the thing claimed disappears."

*Eames v. Godfrey*, 68 U.S. (1 Wall.) 78, 79, 17 L.Ed. 547 (1864):

The law is well settled by repeated adjudications in this court and the Circuit Courts of the United States, that there is no infringement of a patent which claims mechanical powers in combination unless all the parts have been substantially used. The use of a part less than the whole is no infringement.

*Gould v. Rees*, 82 U.S. (15 Wall.) 187, 194, 21 L.Ed. 39 (1872):

Where the defendant in constructing his machine omits entirely one of the ingredients of the plaintiff's combination without substituting any other, he does not infringe, and if he substitutes another in the place of the one omitted, which is new or which performs a substantially different function, or if it is old, but was

not known at the date of the plaintiff's invention as a proper substitute for the omitted ingredient, then he does not infringe.

*Dunbar v. Myers*, 94 U.S. (4 Otto) 187, 202, 24 L.Ed. 34 (1876): "[I]t is settled law, that, where the respondent in constructing his machine omits one of the ingredients of the complainant's combination, he does not infringe the complainant's patent."

*Water–Meter Co. v. Desper*, 101 U.S. (11 Otto) 332, 335–37, 25 L.Ed. 1024 (1879):

It is a well-known doctrine of patent law, that the claim of a combination is not infringed if any of the material parts of the combination are omitted. It is equally well known that if any one of the parts is only formally omitted, and is supplied by a mechanical equivalent, performing the same office and producing the same result, the patent is infringed.

....

It may be observed, before concluding this opinion, that the courts of this country cannot always indulge the same latitude which is exercised by English judges in determining what parts of a machine are or are not material. Our law requires the patentee to specify particularly what he claims to be new, and if he claims a combination of certain elements or parts, *we cannot declare that any one of these elements is immaterial. The patentee makes them all material by the restricted form of his claim. We can only decide whether any part omitted by an alleged infringer is supplied by some other device or instrumentality which is its equivalent.* [Emphasis added.]

*Accord Case v. Brown*, 69 U.S. (2 Wall.) 320, 327–28, 17 L.Ed. 817 (1864); *Gill v. Wells*, 89 U.S. (22 Wall.) 1, 26–30, 22 L.Ed. 699 (1874); *Fuller v. Yentzer*, 94 U.S. (4 Otto) 288, 297, 24 L.Ed. 103 (1876); *Gage v. Herring*, 107 U.S. (17 Otto) 640, 648, 27 L.Ed. 601 (1882); *Fay v. Cordesman*, 109 U.S. 408, 420–21, 3 S.Ct. 236, 244, 27 L.Ed. 979 (1883); *Rowell v. Lindsay*, 113 U.S. 97, 102, 5 S.Ct. 507, 510, 28 L.Ed. 906 (1885); *Sargent v. Hall Safe & Lock Co.*, 114 U.S.

63, 86, 5 S.Ct. 1021, 1033, 29 L.Ed. 67 (1885); *Brown v. Davis,* 116 U.S. 237, 252, 6 S.Ct. 379, 387, 29 L.Ed. 659 (1886); *Yale Lock Mfg. Co. v. Sargent,* 117 U.S. 373, 378, 6 S.Ct. 931, 933, 29 L.Ed. 950 (1886); *McClain v. Ortmayer,* 141 U.S. 419, 425, 12 S.Ct. 76, 78, 35 L.Ed. 800 (1891); *Wright v. Yuengling,* 155 U.S. 47, 52, 15 S.Ct. 1, 3, 39 L.Ed. 64 (1894); *Black Diamond Coal Mining Co. v. Excelsior Coal Co.,* 156 U.S. 611, 617–18, 15 S.Ct. 482, 484, 39 L.Ed. 553 (1895); *Cimiotti Unhairing Co. v. American Fur Ref. Co.,* 198 U.S. 399, 410, 25 S.Ct. 697, 702, 49 L.Ed. 1100 (1905).

In accordance with the Supreme Court precedent, the Court of Claims, whose decisions are binding on this court, *South Corp. v. United States,* 690 F.2d 1368, 1370–71, 215 USPQ 657, 658 (Fed.Cir.1982), has consistently held: "[E]ach element of a patented combination is considered to be material and essential. Thus, the omission of any one of the elements of the claimed combination avoids infringement." *Interdent Corp. v. United States,* 187 USPQ 523, 526 (Ct.Cl.Tr.Div.1975), *adopted and aff'd per curiam,* 531 F.2d 547, 552, 209 Ct.Cl. 301, 199 USPQ 191 (1976).

To the same effect are:

*Teledyne McCormick Selph v. United States,* 558 F.2d 1000, 1007–08, 214 Ct.Cl. 672, 685–86, 195 USPQ 261, 267 (1977):

[E]ach and every clause of a claimed invention is considered to be material and essential. *See Strumskis v. United States,* 474 F.2d 623, 627–28, 200 Ct.Cl. 668, 676, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973). Accordingly, the absence of even one element and its equivalent function of a claimed invention places the accused device outside the coverage of the claims.

*Strumskis v. United States,* 175 USPQ 243, 246 (Ct.Cl.Tr.Div.1972), *adopted and aff'd per curiam,* 474 F.2d 623, 627–28, 200 Ct.Cl. 668, 675–76, 177 USPQ 78, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed. 2d 472 (1973):

All the elements which make up the combination defined by claim 5 are considered to be material and necessary.

*Fay v. Cordesman,* 109 U.S. 408, 420, 3 S.Ct. 236, 27 L.Ed. 979 (1883). Accordingly, the omission of any one of the elements making up the claimed combination avoids all charges of infringement. This last principle was announced by the Supreme Court, at least as early as 1842, in the case of *Prouty v. Draper,* 41 U.S. (16 Pet.) 336, 10 L.Ed. 985, and has been consistently followed by this court.

*Autogiro Co. v. United States,* 384 F.2d 391, 403, 181 Ct.Cl. 55, 72, 155 USPQ 697, 707 (1967) (specifically analyzing a claim with means-plus-function elements):

For there to be infringement, it is necessary that every element or its substantial equivalent be found in the accused structures. E.g., *McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 145 USPQ 6 (10th Cir.1965), cert. denied 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851, 148 USPQ 772 (1966); *Texas Co. v. Anderson–Prichard Refining Corp.,* 122 F.2d 829, 50 USPQ 600 (10th Cir.1941); *Alex Lee Wallau, Inc. v. J.W. Landenberger & Co.,* 121 F.Supp. 555, 101 USPQ 383 (S.D.N.Y.1954); *Vollink v. Holland Celery Planter Co.,* 33 F.Supp. 203 (W.D.Mich.1938), aff'd 112 F.2d 576 (6th Cir.1940).

*See also Pacific Submarine & Earthquake Proof Wall Co. v. United States,* 19 Ct.Cl. 234, 242–43 (1884).

The precedent of our other predecessor, the Court of Customs and Patent Appeals, is the same. As stated in *Sealed Air Corp. v. United States Int'l Trade Comm'n:*

It is axiomatic that the claims measure the invention, and courts may neither add to nor detract from a claim. *Cimiotti Unhairing Co. v. American Fur Refining Co.,* 198 U.S. 399, 25 S.Ct. 697, 49 L.Ed. 1100 (1905); *Ohio Citizens Trust Co. v. Lear Jet Corp.,* 403 F.2d 956, 160 USPQ 11 (CA 10 1968). Sealed Air's attempt to substitute an "inventive concept" for the invention set forth in the claims is tantamount to claiming infringement based on a function or result; abstractions cannot be patented. *Westinghouse v. Boyden Power Brake Co.,*

170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898); *Nelson v. Batson,* 322 F.2d 132, 138 USPQ 552 (CA9 1963).

645 F.2d 976, 985, 209 USPQ 469, 477 (Fed. Civ.1981) (footnote omitted). Similarly, *Coleco Indus., Inc. v. United States Int'l Trade Comm'n,* 573 F.2d 1247, 1255, 65 C.C.P.A. 105, 113, 197 USPQ 472, 478 (1978), expresses the principle as follows:

> [The doctrine of equivalents] permits a patentee to realize the full benefit of his patent grant by enabling the patentee to read his patent claims on a device which is *not* within the literal meaning of his claims. It arms a patentee against a person who merely substitutes a functionally equivalent element in a device and thereby practices the invention without bringing his device within a literal reading of the patent claims.

*Accord In re Baird,* 348 F.2d 974, 979, 52 C.C.P.A. 1747, 1753, 146 USPQ 579, 584 (1965).

That infringement is not established where an element of a claim is missing (again in the sense that no equivalent is substituted) was expressly acknowledged by this court and controlled the judgment in *Lemelson v. United States,* 752 F.2d 1538, 224 USPQ 526 (Fed.Cir.1985). As held therein: "It is also well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element *or its substantial equivalent* in the accused device." 752 F.2d at 1551, 224 USPQ at 533 (emphasis added).

*ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1582–83, 221 USPQ 929, 936 (Fed.Cir.1984), similarly holds:

> We infer that the district court necessarily found that the Wells device, lacking the claimed function of overriding a locked key switch, does not function in substantially the same way as the claimed invention. That inference is supported by the record. Accordingly, we conclude that the district court's finding, that the Wells device does not infringe the Sonnenberg patent under the doc-

trine of equivalents, is not clearly erroneous.

In *Amstar Corp. v. Envirotech Corp.,* 730 F.2d 1476, 1484, 221 USPQ 649, 655, (Fed.Cir.), *cert. denied,* 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984), this court refused to "undermine the long-established legal principle that non-infringement is shown when an element or step in the claims is missing from the accused product or process...." *Accord Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1577, 1 USPQ2d 1593, 1604 (Fed.Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Chemical Eng'g Corp. v. Essef Indus., Inc.,* 795 F.2d 1565, 1572–73, 230 USPQ 385, 390–91 (Fed.Cir.1986); *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1533, 3 USPQ2d 1321, 1325 (Fed.Cir.1987).

The principle that infringement requires the presence of every element or its substantial equivalent in the accused device has also been the uniform law of *every* regional circuit. *See* 7 A. Deller, *Walker on Patents* §§ 531, 543, 564 (2d ed. 1972 & Supp.1985); 1 J. Hopkins, *The Law of Patents* 343 (1911) and cases cited therein.

Nothing said in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), represents a discarding of the principle that infringement requires an accused device to appropriate *each* element specified in a claim exactly or by an equivalent. Indeed, *Graver Tank* reaffirms that principle with guidance on what constitutes an equivalent of a required element. The Court's analysis makes clear that only if all parts of the invention as claimed have been appropriated at least equivalently can it be found that the accused infringement works "in substantially the same way." After determining that the accused and claimed compositions performed the same overall work or function (see note 3 *infra*) and achieved the same overall result, the Court directed its further analysis to the equivalency between magnesium, the ingredient specified as an element of the claim, and manganese, the ingredient substituted in the alleged

infringement. In finding equivalency, the Court stated:

> Consideration must be given to the purpose for which *an ingredient* is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform.

339 U.S. at 609, 70 S.Ct. at 857, 85 USPQ at 331 (emphasis added). In sum, the term "equivalents" in the "doctrine of equivalents" refers to "equivalents" of the *elements* of the claim, not "equivalents" of the claimed invention. While a device found to be an infringement under the doctrine of equivalents is, in a sense, "equivalent" to the claimed invention, that conclusion follows from application of the doctrine. It is not the equivalency determination to which the doctrine is directed, but the result thereof. To speak of a device as being an "equivalent" of the patented invention muddles the analysis.[2]

The expression "invention as a whole" does not appear in *Graver Tank*, nor did the Supreme Court even suggest in *Graver Tank* that claim elements need not be satisfied in determining infringement. The coupling of the *Graver Tank* doctrine with the expression "invention as a whole" first appears in *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 219 USPQ 473 (Fed. Cir.1983). A sentence in that opinion states:

> The failure to apply the doctrine of equivalents to the claimed invention as a whole, and the accompanying demand for "obvious and exact" equivalents of two elements the presence of which would have effectively produced literal infringement, was error.

717 F.2d at 1364, 219 USPQ at 482. The conclusion could reasonably be drawn therefrom that literal infringement requires element-by-element analysis and infringement under the doctrine of equivalents discards element-by-element analysis in favor of an "invention as a whole" analysis. One difficulty of an expert in a legal field writing on a problem is the "everyone-knows-that" syndrome. One must read the *Hughes* opinion in the light of the "given" principle that, to establish infringement, each and every element of a claim, of course, must be satisfied in accordance with established precedent. The *Hughes* panel could not and did not depart from that precedent. The *Hughes* analysis was directed to the confusing concept of equivalency under the doctrine and the different concept of equivalency under section 112–6. When it spoke of the doctrine applying to the "invention as a whole," it was not *by implication* or *sub silentio* rejecting the All Elements Rule. It was subsequently explained that the "statement dealt with an *infringement* inquiry implicating an entire claim, as distinguished from a section 112 ¶ 6 inquiry implicating only a 'means plus function' limitation of a claim." *See Perkin–Elmer*, 822 F.2d at 1532–33, 3 USPQ2d at 1324–25 (emphasis supplied). As a careful reading of *Hughes* makes clear, the *elements* of the claim define the metes and bounds of protection, and an equivalent of *each element* of the claim was found in the accused device. (Davis, J., disagreeing that an equivalent of each element was present.)

The legal error this court noted in *Hughes* was that the trial court restricted its equivalency inquiry to "obvious and exact" equivalents of the *disclosed structural embodiment* of certain means-plus-function elements. Equivalency of *structure* of disclosed means is a section 112–6 inquiry. *Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196, 1201, 1 USPQ2d 2052, 2055 (Fed.Cir.1987). Thus, had equivalency of structure been present for each means-plus-function element, the claim would have been literally infringed. The court then analyzed each of the elements which were admittedly not present *literally* in the accused device, elements (e), (f), and (g), and held that *each* was present by

---

2. The Supreme Court disapproved this type of analysis as early as *Burr v. Duryee*, 68 U.S. (1 Wall.) 531, 573, 17 L.Ed. 650 (1863):

> The [erroneous] argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect, is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term "equivalent."

a means in the accused device which performed *an equivalent function.*[3] 717 F.2d at 1364–66, 219 USPQ at 483–84. Thus, the *Hughes* case took no different view of the law.

The above precedent on the legal standard for infringement is not simply a policy choice by the courts. Other precedent permits no lesser standard. Violation of rights arising from a patent grant carries serious penalties. Each grant is in effect an extension of the statute itself. As a matter of due process under the fifth amendment, reasonable notice must be given to the public of what conduct must be avoided. Whether in civil or criminal proceedings, it is unequivocally established that that basic right to notice applies. *A.B. Small Co. v. American Sugar Ref. Co.,* 267 U.S. 233, 239, 45 S.Ct. 295, 297, 69 L.Ed. 589 (1925). Thus, Congress placed in the statute the requirement that the patent application "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112-2 (1982). That requirement reflects the need for notice of what constitutes violation of a patentee's rights. The public cannot be held to "obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all." *A.B. Small,* 267 U.S. at 239, 45 S.Ct. at 297. Further, the courts cannot, by interpretation, place a gloss on the statutory requirement which has that effect. *Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964). An infringement standard as vague as application of the "invention as a whole," which permits claim limitations to be read out of the claim, would nullify the statutory requirement and violate due process. It would also run counter to the specific limitations and protections of 35 U.S.C. §§ 251 and 252 (1982) with respect to broadening claims after issuance.

The doctrine of equivalents was *created* as a matter of equity, but its *application* does not depend simply on "equities." Infringement on the basis of judicial fiat or jury sympathies resolving the vague question of whether a "fraud" has been committed on the "invention as a whole" *cannot* be the law. *See A.B. Small,* 267 U.S. at 239, 45 S.Ct. at 297 (due process contravened where no specific or definite act was forbidden and liability depended on acts being "unjust and unreasonable in the estimation of the court and jury").

PAULINE NEWMAN, Circuit Judge, commentary.

This court, sitting *in banc,* has dealt a conspicuous change to a major jurisprudence in patent cases: the judicially created "doctrine of equivalents".

The court has adopted a view of the "doctrine" that facially contradicts the leading decisions of this court and of the Supreme Court. The court has also ordered a dramatic retrenchment in its equitable authority. Yet the majority declines to distinguish or discuss its departure from binding precedent, indeed declines even to cite this court's closest decisions. The majority can not be oblivious to the *in banc* weight of its opinion, or to the muddle of uncertainty that it will cause.

This court is bound by *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950), and by our own extensive precedent as represented by *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 219 USPQ 185 (Fed.Cir.1983); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 219 USPQ 473 (Fed.Cir.1983); *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572, 220 USPQ 1 (Fed.Cir.1983); *Carman Industries, Inc. v. Wahl,* 724 F.2d 932, 220 USPQ 481 (Fed.Cir.1983); *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 221 USPQ 669 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120

---

3. Part of the misreading of *Hughes* is apparently due to the double "function" inquiry—one being the *overall* function [work] of the device; the other the function of the means-plus-function *element.* The "function" in the func- tion/way/result test of *Graver Tank* is not the "function" of a single means element. The latter is part of the inquiry into whether the accused device works in the "same way."

(1984); *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 221 USPQ 929 (Fed.Cir.1984); *Martin v. Barber,* 755 F.2d 1564, 225 USPQ 233 (Fed.Cir. 1985); *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 228 USPQ 90 (Fed.Cir.1985); *Great Northern Corp. v. Davis Core & Pad Co.,* 782 F.2d 159, 228 USPQ 356 (Fed. Cir.1986); *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 229 USPQ 992 (Fed.Cir.1986); *Chemical Engineering Corp. v. Essef Industries, Inc.,* 795 F.2d 1565, 230 USPQ 385 (Fed.Cir.1986); *Texas Instruments, Inc. v. U.S. Int'l Trade Comm.,* 805 F.2d 1558, 231 USPQ 833 (Fed.Cir.1986); *Perkin–Elmer Corp. v. Westinghouse Electric Corp.,* 822 F.2d 1528, 3 USPQ2d 1321 (Fed. Cir.1987); and others. The dissent, recognizing *stare decisis,* challenged the majority to explain.

The majority does not respond. However, one judge has written a personal opinion that this court's precedent is wrong and that *Graver Tank* has, since its appearance in 1950, been misinterpreted. This court's leading decision on equivalency[1], factually on all fours with the case at bar, is dismissed as having been written by a judge who suffered from the " 'everyone-knows-that' syndrome", and as having been "misread" ever since. "Additional views", *supra* at 953–54. The majority, *in banc,* remains silent.

I must express dismay at this judicial style. The technology-based community can not be reassured by our avoidance of the responsibility, so recently assigned to this court, for coherent guidance in the patent law. Critical changes should not be made within a stonewall of silence.

## I

## THE ISSUE ON APPEAL

Although many issues were raised by appellant Pennwalt, the majority disposed

of the case on a single, novel question: can an accused machine *ever* be "equivalent" to a patented machine, in accordance with the doctrine of equivalents, if the accused machine omits any "function" (as the majority calls it) that appears in the patent claim. To this question the majority's answer is an emphatic NO, such that infringement in such cases is defeated as a matter of law, immune from the scrutiny of equity and the precedent of the Supreme Court.

The subsidiary question raised by the majority opinion is: when is a "function" omitted? Is it omitted when it is consolidated with another "function", or when less than all the provisions of a complex claim clause are performed? What if the function is peripheral to the invention, or becomes superfluous due to unrelated technological advance? Is every descriptive word in a claim clause a "function"? Is every "function" a "limitation"? (see the distinction between "element" and "limitation" made in *Perkin–Elmer v. Westinghouse,* 822 F.2d at 1533 n. 9, 3 USPQ2d at 1325 n. 9).

All of these aspects are involved in this case, and are not discussed by the majority, although they are tacitly decided against the patentee.

The majority's decision should be viewed in the context of the case on appeal. The Pennwalt invention is a sorting machine. The item to be sorted, such as fruit, is weighed and its color is determined, in a device whose movements and actions are electronically controlled; finally the fruit is discharged into a bin based on its color and weight. A device that successfully sorted by both color and weight was new to the sorting art, and the Pennwalt machine was mechanically and electronically complex.

The majority discusses only Pennwalt's claim 10, which, like the other claims, is in the means-plus-function form authorized in 35 U.S.C. § 112 ¶ 6[2]. Claim 10 includes

---

**1.** *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 219 USPQ 473 (Fed.Cir.1983), has been cited in over eighty published decisions of this and other courts.

**2.** 35 U.S.C. § 112 ¶ 6: An element in a claim for a combination may be expressed as a means or

step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

clauses directed to the functions of weighing, color determination, and discharge, and to the various electronic functions. The disputed "function", that on which the majority decision turns, relates to the indication of the fruit's position as it moves through the sorter. Claim 10 follows:

10. An automatic sorting apparatus comprising

electronic weighing means for generating a signal proportional to the weight of an item to be sorted,

first reference signal means for providing a predetermined number of reference signals, the value of each signal being established according to a predetermined criteria,

first comparison means for comparing the signal generated by said electronic weighing means to the reference signals provided by said first reference signal means,

optical detection means for generating a signal proportional to the color of an item to be sorted,

second reference signal means for providing a predetermined number of reference signals, the value of each signal being established according to a predetermined criteria,

second comparison means for comparing the signal generated by said optical detection means to the reference signals provided by said second reference signal means, and generating a signal therefrom,

clock means for incrementally signalling changes in the position of the item to be sorted,

first position indicating means responsive to a signal from said clock means and said signal from said second comparison means for continuously indicating the position of an item to be sorted while the item is in transit between said optical detection means and said electronic weighing means,

second position indicating means responsive to the signal from said clock means, the signal from said first comparison means and said first position indicating means for generating a signal continu-

ously indicative of the position of an item to be sorted after said item has been weighed, and

discharge means responsive to the signal from said second position indicating means for discharging the item at a predetermined one of a plurality of sorting positions.

There is no issue that all of the "means" set out in all of the claim clauses are found in the accused Durand–Wayland model, except for that of "continuously indicating" the fruit's position while it is in transit to the weighing means and then to the discharge bin, as described in the penultimate two clauses. In the accused device a modified electronic memory keeps track of the movement of the fruit, and indicates when it reaches the weighing means and the discharge bin; that is, it indicates when the fruit has reached the next stop in its passage through the device. But the "continuous" indication of the fruit's position while in transit is superfluous and is not done. (Both sides testified that "continuous" indication is not done, in either the Pennwalt commercial device or the accused device.)

According to the majority, because the position indication is not "continuous", a claimed "function" is not performed. All "functions" mentioned in claims are defined by the majority as essential, simply because they're there, whatever their role in the patented invention and whatever their part in the clause in which they appear. The majority states the sweeping rule that if "even a single function required by a claim or an equivalent function is not performed", that ends the inquiry under the doctrine of equivalents. The majority bars consideration of the significance of any "function" in the overall invention or in any part thereof, and holds that the omission of any "function" that is mentioned in any claim clause *ipso facto* transports the accused device beyond the reach not only of literal infringement, but also of the doctrine of equivalents.

The majority thus bars consideration of the role of "continuous" indication in the Pennwalt invention viewed as a whole, based on the absence of "element-by-ele-

ment correspondence" between the claimed invention and the accused device.

The majority approach is apt for determining literal infringement. One-to-one correspondence between every element of a claim and an accused device is the standard formula for inquiry into literal infringement. But this formula is an incorrect application of the doctrine of equivalents, contrary to the precedent of the Supreme Court and this court.

I do not write these additional views because I disagree with the majority result; although I do, for the reasons stated in the dissenting opinion. I write to balance the historical record on which the majority bases its decision.

## II

### PRINCIPLES OF THE DOCTRINE OF EQUIVALENTS AS EXPOUNDED BY THE SUPREME COURT

The Supreme Court developed and applied, over more than a century of thoughtful analysis, the basic principles of the doctrine of equivalents. From its earliest appearance, in this nation and in the British courts of chancery, the doctrine of equivalents was recognized as an equitable remedy against wrongful appropriation of a patented invention.

Depending on the invention and the device in controversy, the Supreme Court variously applied the doctrine of equivalents to the patented invention viewed as a whole, or to parts or elements thereof. Throughout its history, the Court avoided constraining the doctrine with rigid formulae. Founded on the principles of equity, the doctrine of equivalents evolved as patent law evolved. It reflected changes in patent practice, and it accommodated changes in technology over periods of dramatic industrial growth. Its supreme purpose was and is to serve the interests of justice.

The Supreme Court often discussed the place in advancing technology of the invention it was reviewing, when determining the just scope merited by a patented invention as against an accused device. The Court recognized that some elements of a

patented device were essential, and others less so; and as the law and style of patent claims evolved, the Court's discussions of equivalency kept pace.

A body of judicial decision arose that is extensive, well developed, and remarkably constant. That body of decision has not been cited, discussed, or recognized by the majority.

### A

*Early Courts Determined Infringement Based on Substantial Similarity to the Description of the Invention.*

*1. The Patent Act of 1793 did not provide for patent examination or patent "claims".*

Judicial determinations of equivalency were made before as well as after the development of systems of patent examination and patent claims. The decisions must be understood in the context of the practices of the time.

The patent grant before 1793 was not automatic, but was subject to review by a committee consisting of the Secretary of State, the Secretary of War, and the Attorney General. Act of April 10, 1790, ch. 7, § 1, 1 Stat. 109, 109–10 (1790). History records that the increasing burdens of this review led to change in 1793, whereby the patent was routinely granted, subject only to formalities and the payment of a fee.

The Patent Act of 1793, ch. 11, § 3, 1 Stat. 318, 321–22 (1793), required the applicant to

deliver a written description of his invention, and of the manner of using, or process of compounding the same, in such full, clear, and exact terms, as to distinguish the same from all other things before known....

In infringement actions the accused device was compared with the description in the patent document. Defenses such as lack of novelty, or prior use, were considered by the courts. A finding of infringement did not require precise correspondence between the description and the accused device. The trial courts deter-

958

mined, often by jury, whether there was "substantial similarity" between the accused device and that described in the patent. For example, in *Odiorne v. Winkley*, 18 F. Cas. 581, 582 (C.C.D.Mass.1814) (No. 10,432), the court, Story, J., charged the jury:

> The first question for consideration is, whether the machines used by the defendant are substantially, in their principles and mode of operation, like the plaintiff's machines. If so, it was an infringement of the plaintiff's patent to use them.... Mere colorable alterations of a machine are not sufficient to protect the defendant.

*See also Lowell v. Lewis*, 15 F. Cas. 1018, 1021 (C.C.D.Mass.1817) (No. 8,568) ("whether the defendant has violated the patent-right of the plaintiff ... depends upon the fact, whether the pumps of Mr. Perkins and of Mr. Baker are substantially the same invention").

Our research showed no issue of equivalency, i.e. "substantial" similarity, in the cases that reached the Supreme Court during this early period, although several other significant aspects of patent law were treated by the Court. *See, e.g., Evans v. Eaton*, 16 U.S. (3 Wheat.) 454, 4 L.Ed. 433 (1818), the first patent infringement decision of the Supreme Court.

*2. The Patent Act of 1836 provided for patent examination and for a statement of the inventor's "claim".*

The Patent Act of 1836, ch. 357, 5 Stat. 117 (1836), was enacted at a time of burgeoning industrial activity and creativity, growth in patent filings [3] and, inexorably, increasing infringement litigation. Section 6, 5 Stat. 119, provided that an applicant for patent

> shall particularly specify and point out the part, improvement, or combination,

which he claims as his own invention or discovery.

It is not clear from the legislative history whether the purpose of the requirement for particularity was to facilitate examination or enforcement, but the style and content of the ensuing "claims" were significantly different from those of later practice. The applicant simply named the broad features that embodied the invention, accompanied by such words as "substantially as set forth". The claims

> served merely to call attention to what the inventor considered the salient features of his invention. The drawings and description were the main thing, the claims a mere adjunct thereto.

R. Ellis, *Patent Claims*, § 3 (1949) [hereinafter *"Ellis"*]. *Ellis* cites a typical claim, published by the Patent Office in 1869:

> [1.] The combination of the cutters EE, and the feeding rollers II and JJ, substantially as and for the purpose hereinbefore set forth.

*Id.*, § 6. This is the style of claim that was before the Court in most of the early decisions that are cited in asserted support of the majority position. The Court explained in *The Corn Planter Patent*, 90 U.S. (23 Wall.) 181, 218, 23 L.Ed. 1 (1874), that a clause such as "substantially as set forth"

> throws us back to the specification for a qualification of the claim, and the several elements of which the combination is composed.

To this extent early claim form was a precursor of the "means-plus-function" form of today,[4] in that they both incorporate by reference the description in the specification and equivalents thereof.

Infringement continued to be determined by comparison of the accused device with the description in the specification. *See,*

---

**3.** The Act created the Patent Office, headed by a Commissioner of Patents. Construction of a Patent Office Building (now the National Portrait Gallery) was started in 1836.

**4.** 35 U.S.C. § 112 ¶ 6 provides that a functional claim shall be construed to cover the means described in the specification and equivalents. *See* n. 2 *ante.* In 1946 the Court had held,

*Halliburton Oil Well Cementing Company v. Walker*, 329 U.S. 1, 12, 67 S.Ct. 6, 11, 91 L.Ed. 3 (1946), that this form of claim was not limited to "actual equivalents" of the means disclosed, and therefore was invalid. Section 112 ¶ 6 was enacted to reverse that ruling. P.J. Federico, *Commentary on the New Patent Act*, 35 U.S.C.A. 1, 25 (1954).

*e.g., Burr v. Duryee,* 68 U.S. (1 Wall.) 531, 573, 17 L.Ed. 650 (1864):

> [An infringement] is a copy of the thing described in the specification of the patentee, either without variation, or with such variations as are consistent with its being in substance the same thing.

As will be discussed, the doctrine of equivalents flowered during this period, although patent claims played a quite limited role in patent enforcement, serving more to identify the essential features of an invention than to set limits to the scope thereof.

*3. The Patent Act of 1870 started the move to increased specificity in claiming.*

Section 26 of the Patent Act of 1870, ch. 230, 16 Stat. 198, 201 (1870), for the first time required that the applicant

> particularly point out *and distinctly claim* the part, improvement, or combination which he claims as his invention or discovery. [emphasis added]

Judicial decisions during this period show that the transition toward greater specificity was gradual indeed, but by the early 1900s claims "became much more self-sufficient in that they gave the cooperative relationship of the elements enumerated, instead of a mere catalog of elements". *Ellis,* § 6.

There evolved during this period a complex jurisprudence on equivalents, wherein the doctrine was applied to the circumstances of each case, as justice required. As in earlier periods, a patent's claims were less significant in infringement litigation than was the description of the invention, and it was from the specification and drawings that the invention's substance was determined. However, patent claims became of increased importance as they began to reflect adjustments made during the examination process and, at first occasionally and then more frequently, claims were referred to by the courts in determinations both of literal infringement and of infringement by application of the doctrine of equivalents.

*4. Claim form continued to evolve after the Patent Act of 1952.*

According to the modern style, patent claims no longer merely claim the salient features, the "heart" of the invention.[5] Our predecessor court stated in *In re Lundberg,* 244 F.2d 543, 548, 44 C.C.P.A. 909, 916, 113 USPQ 530, 534 (1957):

> [N]otwithstanding the [last] paragraph of section 112, it is the language itself of the claims which must particularly point out and distinctly claim the subject matter which the applicant regards as his invention, *without limitations imported from the specification,* whether such language is couched in terms of means plus function or consists of a detailed recitation of the inventive matter. [emphasis added]

This practice is in sharp contrast with that of the 19th and early 20th centuries. There was a gradual, erratic, but inexorable transition to the requirement that the claims contain sufficient detail so that they can stand alone, without reliance on the specification to show distinctions from the prior art. *Ellis,* § 4, describes this as claiming the perimeter of an invention, rather than its core. Deller calls it "stak[ing] out the metes and bounds of the boundaries", attributing enhanced rigor in claim drafting to the Supreme Court's decision in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966). 1 A. Deller, *Patent Claims,* v-vi (2d ed. 1971). Typical of this form is the Pennwalt claim shown *ante,* with its multiple clauses delineating the entire sorter and its operation. Despite the changes in form and content of patent claims over this long period, the principles of the doctrine of equivalents remained constant.

*B*

*The Supreme Court Applied the Doctrine of Equivalents to the Invention as a Whole and to Parts thereof, as the Facts Required.*

The Supreme Court decisions illustrate consistent judicial application of the doc-

---

5. An apparent exception, the "Jepson" form of claim, occasionally continues to be used. See *Ex parte Jepson,* 243 Off.Gaz.Pat.Office 525 (Ass't.Comm'r.Pat.1917).

trine of equivalents, in accordance with the principles of equity and in a manner appropriate to the facts of each case. The doctrine of equivalents was not restricted by rigid formulae, but turned on the totality of circumstances.

Thus, the Court applied the doctrine to broad and to narrow inventions, remarking that each merited the benefits of the doctrine as its facts warranted. "Pioneer" inventions enjoyed a wider scope of equivalents than "mere narrow improvements". Combinations comprising novel elements drew a more benevolent judicial perspective than combinations consisting solely of old elements.

The Supreme Court's first discussion of the principles of equivalency appeared in *Winans v. Denmead*, 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853). The Court expressed majority and dissenting views barely distinguishable from those in *Graver Tank*, a century later.

In *Winans* the patentee claimed a circular railroad car whose conical design achieved several advantageous benefits; the accused device was octagonal, of otherwise similar conical design, and achieved the same advantages. Addressing the question of whether the patentee's coverage was limited to the embodiment described in the specification, the Court said:

[T]he property of inventors would be valueless, if it were enough for the defendant to say, your improvement consisted in a change of form; you describe and claim but one form; I have not taken that, and so have not infringed.

\* \* \* \* \* \*

Where form and substance are inseparable, it is enough to look at the form only. Where they are separable; where *the whole substance of the invention* may be copied in a different form, it is the duty of courts and juries to look through the form for the substance of the invention—for that which entitled the inventor to his patent, and which the patent was designed to secure; where that is found, there is an infringement; and it is not a defense, that it is embodied in a form not

described, and in terms claimed by the patentee. [emphasis added]

56 U.S. at 342–43. The Court held that the circular and octagonal shapes were substantially the same, in that the accused device embodied "the patentee's mode of operation, and thereby attain[ed] the same kind of result as was reached by his invention." *Id.* at 344. The dissenting opinion argued eloquently for limitation to the circular shape as described:

Fulness, clearness, exactness, preciseness, and particularity, in the description of the invention, its principle, and of the matter claimed to be invented, will alone fulfil the demands of congress or the wants of the country. Nothing, in the administration of this law, will be more mischievous, more productive of oppressive and costly litigation, of exorbitant and unjust pretensions and vexatious demands, more injurious to labor, than a relaxation of these wise and salutary requisitions of the act of congress.

*Id.* at 347.

The decisions since *Winans*, implementing the Court's holding, have given full respect to the equitable purposes of the doctrine. The decisions show a consistent concern for attempted evasions of patent rights by changes that do not affect the substance of the invention. This concern is balanced by judicial restraint against unwarranted stretch of the patent right beyond its just limits. Due to such restraint, exercised in the context of the facts and circumstances of each case, the forebodings expressed in the *Winans* dissent have not been realized. This dissenting view was not iterated by the Court until it appeared, again in dissent, in *Graver Tank*, ninety-seven years later. This minority view had not, until today, prevailed.

Following is a sampling of the Court's decisions, time and again affirming the principles of the doctrine, as the Court applied it to an expanding variety of circumstances.

In *McCormick v. Talcott*, 61 U.S. (20 How.) 402, 15 L.Ed. 930 (1858), the Court distinguished between the breadth of equivalents to which an invention of a new

device is entitled, and improvements in a known device:

> If he be the original inventor of the device or machine called the divider, he will have a right to treat as infringers all who make dividers operating on the same principle, and performing the same functions by analogous means or equivalent combinations, even though the infringing machine may be an improvement on the original, and patentable as such. But if the invention claimed be itself but an improvement on a known machine by a mere change of form or combination of parts, the patentee cannot treat another as an infringer who has improved the original machine by use of a different form or combination performing the same functions.

*Id.* at 404–05.

In *Burr v. Duryee*, 68 U.S. (1 Wall) at 572–73, the Court elaborated, continuing its treatment of the invention as a whole, although not using these precise words:

> [An infringement] is a copy of the thing described in the specification of the patentee, either without variation, or with such variations as are consistent with its being *in substance the same thing....* If the invention of the patentee be a machine, it will be infringed by a machine which ... performs the same service or produces the same effect in the same way, or substantially the same way. [emphasis added]

(citing G. Curtis, *Law of Patents* (2d Ed.), a treatise published in 1854. In *Machine Co. v. Murphy*, 97 U.S. (7 Otto) 120, 125, 24 L.Ed. 935 (1878), the Court viewed both the machine in its entirety, and its separate elements, in applying the principles of equivalency:

> [I]n determining the question of infringement, the court or jury ... [is] to look at *the machines or their several devices or elements* in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same

way to obtain the same result.... [emphasis added]

The claim in *Consolidated Valve Co. v. Crosby Steam Gauge & Valve Co.*, 113 U.S. 157, 162, 5 S.Ct. 513, 515, 28 L.Ed. 939 (1885), illustrates the continuing style of claim drafting, wherein the claim broadly states the essential elements of the invention, with reference to the specification:

> [A] safety valve with the circular or annular flange or lip *c c*, constructed in the manner, or substantially in the manner, shown, so as to operate as and for the purpose herein described.

The Court discussed the inventor's structure and the differences in the accused device and held that:

> When the ideas necessary to success are made known, and a structure embodying those ideas is given to the world, it is easy for the skilful mechanic to vary the form by mechanism which is equivalent, and is, therefore, in a case of this kind, an infringement.

*Id.* at 179, 5 S.Ct. at 525.

Whether dealing with inventions it called "pioneer", or with less dramatic advances, the Court looked for the substance of the patentee's contribution as described in the specification and as claimed, deciding the issue equitably and as the particular facts occasioned. *See, e.g., Morey v. Lockwood*, 75 U.S. (8 Wall.) 230, 242, 19 L.Ed. 339 (1868) (the patentees "are protected ... against the use of any form ... that embodies substantially their ideas and mode of operation"); *Blake v. Robertson*, 94 U.S. (4 Otto) 728, 733, 24 L.Ed. 245 (1877) (stone-crushing machine that used rods and levers held infringed by machine that used hydraulic pressure); *Tilghman v. Proctor*, 102 U.S. (12 Otto) 707, 732, 26 L.Ed. 279 (1881) (various improvements did not alter the essential character of the patented process); *Clough v. Barker*, 106 U.S. (16 Otto) 166, 178 1 S.Ct. 188, 197, 27 L.Ed. 134 (1882) (patentee of a new combination is entitled to "hold as infringements all valve regulations, applied to such a combination, which perform the same office in substantially the same way as, and were known equivalents for, his form of valve regula-

tion"); *Hoyt v. Horne,* 145 U.S. 302, 309, 12 S.Ct. 922, 924, 36 L.Ed. 713 (1892) ("merely the use of an old and well known mechanical equivalent, and obviously intended to evade the wording of the claims of the Hoyt patent"); *Deering v. Winona Harvester Works,* 155 U.S. 286, 302, 15 S.Ct. 118, 124, 39 L.Ed. 153 (1894) ("Otherwise the infringer might take the most important part of a new invention and, by changing the method of adapting it to the machine to which it is an improvement, avoid the charge of infringement").

In *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929), the Court restated the oft-quoted principles:

> [G]enerally speaking, one device is an infringement of another "if it performs substantially the same function in substantially the same way to obtain the same result.... Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." *Machine Co. v. Murphy,* 97 U.S. [7 Otto] 120, 125 [24 L.Ed. 935].... A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement.

The principles of equivalency are not limited to mechanical devices. *Ellis* discusses in § 59 judicial decisions to the effect that equivalency may be found on "change in chemical nature or structure of a composition ingredient or process reagent, which does not affect the operation or function of the composition or the process *as a whole*" (emphasis added). In more recent commentary, Professor Chisum remarks, 4 D. Chisum, *Patents* § 18.04[1], at 18–33 n. 3 (1987): "Note that equivalency is still determined by comparing the *claimed* subject matter *as a whole* and the accused device." (emphases in original).

The Court has applied the converse of the doctrine, to the effect of restricting, rather than enlarging, the *literal* scope of claims. In *Westinghouse v. Boyden Power Brake Co.,* 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136 (1898), expounding the so-called "reverse doctrine of equivalents", the Court said:

> The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent.

The "reverse" doctrine is seen to be no more than a limitation on the scope of the claims, based on the patentee's description in the specification. It reflects the Court's continuing emphasis on the substance of the invention, viewed in its entirety, rather than on the literal form of the claims, such that if justice should require restriction rather than expansion of their literal text, the courts are empowered to do so.

I observe that the majority herein intermingles the principles of literal infringement with those of equivalency. But the absence of literal infringement does not bar access to the doctrine of equivalents; it is the prelude to its application. This principle is as old as the doctrine itself, being the foundation on which the doctrine is based. *See Winans v. Denmead,* 56 U.S. (15 How.) at 342–43:

> If the machine complained of were a copy, in form, of the machine described in the specification, of course it would be at once seen to be an infringement. It could be nothing else. It is only ingenious diversities of form and proportion, presenting the appearance of something unlike the thing patented, which give rise to questions....

The principle has been classically stated:

> Of course the fact that verbally the infringing process is not within the claim

is no objection to the application of the doctrine of equivalents; indeed it creates the very occasion which should evoke it. [citations omitted]

*Musher Foundation, Inc. v. Alba Trading Co.*, 150 F.2d 885, 887, 66 USPQ 183, 185 (2d Cir.) (L. Hand, J.), *cert. denied*, 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465 (1945).

### C

*The Court Recognized that some Inventions are Entitled to a Broader Range of Equivalents than other Inventions*

The doctrine of equivalents has frequently been invoked by patentees, but it has far less frequently been applied in their favor. Courts have judiciously adapted its principles to the facts at issue, cognizant of the complex of interactions between the rights of patentees, on the one hand, and those who seek to use the inventions of others, whether by colorable imitation or by inventive modification. During development and application of a wise jurisprudence on such matters, the courts have avoided subjecting themselves to rigid rules, for the great variety of technological situations are not amenable to all-encompassing rules. My concern is that the courts will now be subjected to a new and far-reaching rule, the need for which has not been shown and the disadvantages of which, to courts and to parties, are manifest.

Precedent shows that in the course of elaboration of the doctrine of equivalents, the courts have emphasized that its application varies with the "character" of the invention, as well as with the nature of the differences between the accused device and the patented invention. *See, e.g., Miller v. Eagle Mfg. Co.*, 151 U.S. 186, 207, 14 S.Ct. 310, 318, 38 L.Ed. 121 (1893):

> The range of equivalents depends upon the extent and nature of the invention. If the invention is broad or primary in its character, the range of equivalents will be correspondingly broad, under the liberal construction which the courts give to such inventions.

Dealing with an invention that it described as "pioneer", the Court said in *Mor-*

*ley Sewing Machine Co. v. Lancaster*, 129 U.S. 263, 273, 9 S.Ct. 299, 302, 32 L.Ed. 715 (1889):

> Morley, having been the first person who succeeded in producing an automatic machine for sewing buttons of the kind in question upon fabrics, is entitled to a liberal construction of the claims of his patent. He was not a mere improver upon a prior machine which was capable of accomplishing the same general result; in which case, his claims would properly receive a narrower interpretation. This principle is well settled in the patent law, both in this country and in England. [citations omitted]

In *Hobbs v. Beach*, 180 U.S. 383, 399, 21 S.Ct. 409, 416, 45 L.Ed. 586 (1901), the Court described the patent as a "pioneer in its limited field":

> We are not concerned with the subordinate differences in the mechanism, least of all with the different names given by Horton to parts of his machine similar to the corresponding parts in the Beach patent. As the two machines are alike in their functions, combination and elements, it is unnecessary to go further and inquire whether they are alike or unlike in their details.

The Court did not limit application of the doctrine to "pioneers". In *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 415, 28 S.Ct. 748, 749, 52 L.Ed. 1122 (1907), the Court said:

> It is manifest, therefore, that it was not meant to decide that only pioneer patents are entitled to invoke the doctrine of equivalents, but that it was decided that the range of equivalents depends upon and varies with the degree of invention.

*See also, e.g., Kokomo Fence Machine Co. v. Kitselman*, 189 U.S. 8, 24, 23 S.Ct. 521, 527, 47 L.Ed. 689 (1903) (patents were not for pioneer inventions, and differences in means and operation between the machines was such that there was no infringement); *Brill v. Washington Railway & Elec. Co.*, 215 U.S. 527, 533, 30 S.Ct. 177, 179, 54 L.Ed. 311 (1910) (Because of the

close prior art, there "would be little room for the doctrine of equivalents. The defendant's device ... does not infringe the very narrow claim which is the most that in any view could be allowed"); *Abercrombie & Fitch Co. v. Baldwin*, 245 U.S. 198, 209, 38 S.Ct. 104, 107, 62 L.Ed. 240 (1917) (infringement by well-known substitute); *Brothers v. United States*, 250 U.S. 88, 89, 39 S.Ct. 426, 63 L.Ed. 859 (1919) ("plaintiff's invention was broadly new, a pioneer in its line, and the patent [was] entitled to a broad construction and the claims to a liberal application of the doctrine of equivalents").

I belabor that in all cases the Court viewed the substance of the patented invention, avoided the rigors of formulae and dogma, and applied the doctrine of equivalents as the facts and circumstances, and justice, merited.

## D

### *The Court Recognized that Some Elements of an Invention May be More Important than Others.*

In harmony with changes in the style of claim drafting, the Court recognized that it was necessary to separate the important and unimportant aspects of an invention in order correctly to apply the doctrine of equivalents. For example, in *Machine Co. v. Murphy*, 97 U.S. at 125, the Court remarked that:

> Inquiries of this kind are often attended with difficulty; but if special attention is given to such portions of a given device as really does the work, so as not to give undue importance to other parts of the same which are only used as a convenient mode of constructing the entire device, the difficulty attending the investi-

gation will be greatly diminished, if not entirely overcome. *Cahoon v. Ring*, 1 Cliff. 620 [F.Cas. 2292, 1 Cliff. 592, 1 Fish.Pat.Cas. 397 (1861)].

In *National Cash Register Co. v. Boston Cash Indicator Co.*, 156 U.S. 502, 517, 15 S.Ct. 434, 440, 39 L.Ed. 511 (1895), the Court observed that a change in a "wholly immaterial feature" does not avoid infringement; and in *Westinghouse v. Boyden*, 170 U.S. at 561, 18 S.Ct. at 718, the Court held that an enclosure for a valve, included as an express limitation of the claim, was "immaterial" in determining infringement.

In contrast, when an element was essential to the patented device [6] and was omitted entirely in an accused device, the Court denied equivalency because of the effect of the omission on the invention as a whole. *See, e.g., Black Diamond Co. v. Excelsior Co.*, 156 U.S. 611, 616–18, 15 S.Ct. 482, 483–84, 39 L.Ed. 553 (1895) (no infringement because an element essential to patentability of the invention was absent in the accused device).

As summarized in *Ellis*, § 33:

> An invention, however, usually has minor as well as major features. The doctrine of equivalents may be invoked as to either or both the minor and major features. . . .

> The less important the minor feature is relatively to the main feature, the wider the range of equivalents as applied to the minor feature. This is due to the fact that a subsidiary feature of an invention can be radically changed with less effect on *the invention as a whole* than a relatively minor change in the main feature of the invention. [emphasis added]

---

**6.** Application of the doctrine of equivalents is subject to the principles of prosecution history estoppel and estoppel based on the prior art, aspects not here directly at issue, but pertinent to determination, for example, of whether a claim element is essential to the patented invention. There are old roots to this extensive body of decision, which has classically restrained the doctrine from unduly broad application. *See, e.g., Shepard v. Carrigan*, 116 U.S. 593, 597, 6 S.Ct. 493, 494, 29 L.Ed. 723 (1886); *Schriber–Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211,

220–21, 61 S.Ct. 235, 239, 85 L.Ed. 132 (1940). As stated in *I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 443, 47 S.Ct. 136, 141, 71 L.Ed. 335 (1926):

> It is well settled that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of the patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent.

It was manifest in the Court's repeated evaluations of the role of various features of patented inventions that equivalency was determined in respect of the invention as a whole.

In the early style of claim drafting minor features were not written into the claims, leaving only essential features. This is especially pertinent when the invention was a "combination of old elements", the subject of the following line of decisions:

*E*

*The special case of a combination of old elements.*

The Supreme Court early treated the class of invention it called a "combination of old elements" as a special case. In *Imhaeuser v. Buerk,* 101 U.S. (11 Otto) 647, 25 L.Ed. 945 (1879), the Court referred to the "special signification" of equivalency as applied to a novel combination of old elements:

> Equivalents may be claimed by a patentee of an invention consisting of a combination of old elements or ingredients....

> Such a patentee may doubtless invoke the doctrine of equivalents as against an infringer of the patent: but the term "equivalent," as applied to such an invention, is *special in its signification,* and somewhat different from what is meant when the term is applied to an invention consisting of a new device or an entirely new machine. [emphasis added]

*Id.* at 655–56. In this class of invention it was only the combination that was new, such combination comprising certain essential elements.[7] The Court has consistently held that when an essential element of a combination of old elements is not present in the accused device, there is no infringement.

The critical premise is that, in a combination of old elements, each element is essential to the patented invention, and its omis-

sion "destroys the combination". As Professor Robinson explained in 1890:

> [I]t is important that the radical distinction between a combination and a simple invention should be constantly remembered; for the same apparent change which, in a simple invention, would be but a substitution of equivalents might, in a combination, introduce a new idea of means....

> [A combination's] identity depends upon the presence of each one of [the] specific elemental means.... Hence the removal of a single one of these subordinate means destroys the combination....

W. Robinson, *The Law of Patents,* § 254 (1890) [hereinafter *"Robinson"*].

When applying the doctrine of equivalents to combinations of old elements, the Supreme Court recognized that for such inventions patentability depended on the novelty of the combination, and applied the doctrine commensurately. A change in an essential element of a combination of old elements produces a new combination; it is no longer the same or an equivalent combination. In the words of *Robinson,* § 255, it is a "substantive invention":

> [A]ny substitution in the essential elements of a combination which affects either the means or function of the single element passes beyond the region of equivalents into the sphere of substantive invention.

An early example of this genre is *Prouty v. Ruggles,* 41 U.S. (16 Pet.) 336, 341, 10 L.Ed. 985 (1842):

> The patent is for a combination, and the improvement consists in arranging different portions of the plough, and combining them together in the manner stated in the specification for the purpose of producing a certain effect. None of the parts referred to are new, and none are claimed as new; nor is any portion of the combination less than the whole claimed as new, or stated to produce any given result.

7. We are not here concerned with historic variations in criteria for the patentability of "combinations", *see* H.T. Markey, *Why Not the Statute?,* 65 J.Pat.Off.Soc'y 331, 333–34 (1983), although that issue is not unrelated to the Court's treatment of infringement and equivalency of combination claims.

The Court in *Prouty* observed that the patented invention is not "the same improvement" when an essential element of the combination is omitted:

> [T]his combination ... is the thing patented. The use of any two of these parts only, or of two combined with a third, which is substantially different, in form or in the manner of its arrangement and connection with the others; is therefore *not the thing patented.* [emphasis added]

*Id.* at 341.

Thus when the only patentable aspect is the combination itself, each essential element of the combination must be present in the accused device in order to find infringement. *Fuller v. Yentzer,* 94 U.S. (4 Otto) 288, 296–97, 24 L.Ed. 103 (1877). The Court did not deny all equivalents, but for each essential element of the combination the Court required that any equivalent must be a known substitute for the replaced ingredient. *See Imhaeuser,* 101 U.S. at 656:

> Patentees of an invention consisting merely of a combination of old ingredients are entitled to equivalents, by which is meant that the patent in respect to each of the respective ingredients comprising the invention covers every other ingredient which, in the same arrangement of the parts, will perform the same function, if it was well known as a proper substitute for the one described in the specification at the date of the patent.

The Court had established that substitution of one known structure for another in the combination did not avoid infringement, unless the effect was to change the combination as a whole. As stated in *Eames v. Godfrey,* 68 U.S. (1 Wall.) 78, 79–80, 17 L.Ed. 547 (1863):

> [A combination of old elements] differs essentially in its principles from one where the subject-matter is new.
>
> \*      \*      \*      \*      \*      \*
>
> Eames had a right to use any of the parts in Godfrey's combination, if he did not use the whole; and if he used all the parts but one, and for that substituted another mechanical structure substantial-

ly different in its construction and operation, but serving the same purpose, he was not guilty of an infringement.

*See also Brooks v. Fiske,* 56 U.S. (15 How.) 212, 219, 14 L.Ed. 665 (1853) ("The combination and arrangement ... was the only novelty in the invention"); *Gould v. Rees,* 82 U.S. (15 Wall.) 187, 194, 21 L.Ed. 39 (1872) (the patented combination is avoided "if the ingredient substituted was a new one, or performs a substantially different function, or was not known"); *Gill v. Wells,* 89 U.S. (22 Wall.) 1, 26–30, 22 L.Ed. 699 (1874) ("the combination is an entirety, and that if one of the ingredients be given up the thing claimed disappears, which is an obvious truth, as the invention in such a case consists simply in the combination"); *Brown v. Davis,* 116 U.S. 237, 249, 29 L.Ed. 659 (1886) (the lever is an essential element of the combination, and replacing it with the human hand avoids infringement); *McClain v. Ortmayer,* 141 U.S. 419, 425, 12 S.Ct. 76, 78, 35 L.Ed. 800 (1891) ("the patentee is [not] at liberty to say that the spring encircling the after wale is immaterial and useless").

Throughout this period the Court appeared to view inventions of new combinations of old elements as different from other classes of inventions. In *Seymour v. Osborne,* 78 U.S. (11 Wall.) 516, 556, 20 L.Ed. 33 (1870), the Court distinguished the "mere combination" as follows:

> Patentees, therefore, are entitled in all cases to invoke to some extent the doctrine of equivalents, but they are never entitled to do so in any case to suppress all other substantial improvements, and the rule which disallows such pretensions, if properly understood and limited, is as applicable to the inventor of a device, or even of an entire machine, as to the inventor of a mere combination, *except that* the inventor of the latter cannot treat any one as an infringer whose machine does not contain all of the material ingredients of the prior combination.... [emphasis added]

This distinction was carried forward in *Graver Tank,* where the Court called a

combination of old ingredients a "secondary invention":

> The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, *Imhaeuser v. Buerk*, 101 U.S. [ (11 Otto) ] 647, 655, [25 L.Ed. 945] although the area of equivalence may vary under the circumstances.

339 U.S. at 608, 70 S.Ct. at 856.

This view of equivalency was in useful harmony with the contemporaneous style of patent claims. When the claims named only the essential elements, removal of an essential element changed the combination so that it was neither "the thing patented" nor the thing claimed. *See, e.g., Vance v. Campbell*, 66 U.S. (1 Black) 427, 429–30, 17 L.Ed. 168 (1862) ("the patentee not only described, but claimed the front flue . . . as a material and important part of the arrangement"); *Water–Meter Co. v. Desper*, 101 U.S. (11 Otto) 332, 336, 25 L.Ed. 1024 (1880) ("We cannot say that the crank-shaft was an immaterial part of their combination"); *Gage v. Herring*, 107 U.S. (17 Otto) 640, 648, 27 L.Ed. 601 (1883) ("But the patentee, in his specification and in his only valid claim, has made each of the conveyors, as well as the elevator, a material part of the combination invented and patented by him"); *Fay v. Cordesman*, 109 U.S. 408, 420–21, 3 S.Ct. 236, 244, 27 L.Ed. 979 (1883) ("if the patentee specifies any element as entering into the combination, either directly by the language of the claim, or by such a reference to the descriptive part of the specification as carries such element into the claim, he makes such element material to the combination, and the court cannot declare it to be immaterial"); *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 373, 378, 6 S.Ct. 931, 933, 29 L.Ed. 950 (1886) (element was "made essential" by description and claim); *Wright v. Yuengling*, 155 U.S. 47, 52, 15 S.Ct. 1, 3, 39 L.Ed. 64 (1894) ("the patentee, having described [the feature] in the specification and declared it to be an essential feature of his invention, and having made it an element of these two claims,

is not now at liberty to say that it is immaterial").

This special class of cases is the subject of the "additional views" filed in support of the majority, *see supra* at 949–52, and additional examples are presented therein. These cases are not authority for imposing on the doctrine of equivalents a "hoary all elements rule". *Id.* at 949. No such general rule of equivalency is enunciated in these cases.

## F

*Omission of An Element, or Combining or Separating Elements, May Not Avoid Application of the Doctrine of Equivalents.*

Even when an accused device completely omits a claimed element, or combines separate claimed elements, such a device has been, depending on the facts of the case, subject to application of the doctrine of equivalents.

*Ellis* observed at § 61 that "[t]here are a few cases in which infringement has been held where an element has been omitted without any semblance of an equivalent substituted therefor." In such cases, necessarily, the courts determined that the omission of the element did not substantially affect the invention as a whole.

In *Royer v. Schultz Belting Co.*, 135 U.S. 319, 10 S.Ct. 833, 34 L.Ed. 214 (1890) the patented device was a vertical cylindrical crib with a slotted rotating shaft running its length. The claims read:

> 1. The vertical shaft B with a slot, B', and setscrews *b b b*, said shaft having a forward and back motion, substantially as and for the purpose described.
>
> 2. The pins or rollers C C C, set in the rings D and D', together with the grooved weight I, substantially as and for the purposes described.

*Id.* at 322, 10 S.Ct. at 834. The accused device did not contain the slot, the pins or rollers, or the grooved weight. The Circuit [trial] Court held that the accused device did not infringe as a matter of law; the Supreme Court reversed, stating that the questions of whether the invention was of a primary character, and thus entitled to a

broader range of equivalents despite the omitted elements, were questions of fact for the jury.

In *United States v. Harvey Steel Co.*, 227 U.S. 165, 33 S.Ct. 258, 57 L.Ed. 464 (1913), the Supreme Court affirmed the Court of Claims' holding that the claimed invention was not avoided by omitting the sand backing that was an element in the claim. The claim read in part:

1. The herein-described method of producing a decrementally hardened tenacious armor plate, which consists of inclosing a low steel plate between a mass of noncarbonaceous material [sand] on one side and a mass of granular carbonaceous material firmly packed upon the other side....

*Id.* at 167, 33 S.Ct. at 259. The Court held:

The brick box containing the carbonaceous material prevented the same from reaching the back and sides of the plates, thus *accomplishing the same result as with the [omitted] sand* which was used to protect the back of the plate from the carbonaceous material and excessive heat as aforesaid.... [emphasis added]

*Id.* at 171, 33 S.Ct. at 261.

The inquiry turns on the role of the omitted element on the overall invention. When the omitted element is important to the working of the invention as a whole, its omission avoids infringement. See *Railway Co. v. Sayles*, 97 U.S. (7 Otto) 554, 562, 24 L.Ed. 1053 (1878), where the accused device lacked an element which was a "marked feature" of the invention, "and one on which stress is laid in the original application"; and *Knapp v. Morss*, 150 U.S. 222, 229–30, 14 S.Ct. 81, 84, 37 L.Ed. 1059, in which the accused device was missing "sliding blocks" and "rests", two of the five elements of the claim, and was held not to infringe. The *Knapp* Court stated, however, that

If the Hall patent was a valid pioneer invention, the doctrine of equivalents might be invoked with regard to the sliding blocks and rests, and thus a different question would be raised....

*Id.* at 230, 14 S.Ct. at 84.

The lower courts continued to apply this fundamental principle, viewing the whole invention and determining the effect of the omission or other modification. For example, in *American Stainless Steel Co. v. Ludlum Steel Co.*, 290 F. 103, 109 (2d Cir.1923), the circuit court said:

It was held below, and has not been here successfully disputed, that, omitting silicon, defendant has produced stainless steel; with the silicon added, it has also produced stainless steel; therefore, in respect of infringement, the silicon is *immaterial*, no matter how beneficial it may be. [emphasis added]

*See also Cincinnati Car Co. v. New York Rapid Transit Corp.*, 35 F.2d 679, 682 (2d Cir.1929) ("We do not forget that claims one, three and five each contemplate two sockets and that the defendant has only one").

Trial courts continue to discern the logic, as well as the justice, in this approach to equivalency. In *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 663 F.Supp. 697, 705 (N.D.N.Y.1987), the district court stated:

The court can envision instances, though, where one or a number of elements of an alleged infringing device are not equivalent to elements in the claim or claims of a patented device, and a conclusion of infringement under the doctrine of equivalents can still be made. This result is also logical, because if the elements of the alleged infringing device that are not equivalent to elements in the patent are not crucial to how the device performs, or the result that it obtains, then the device as a whole could still perform substantially the same function in substantially the same way to obtain the same result as the patented device.

Similarly, expanding one element into two, or combining two elements into one, does not preclude application of the doctrine of equivalents. The solidity of this precedent was referred to by Judge L. Hand in *Royal Typewriter Co. v. Remington Rand, Inc.*, 168 F.2d 691, 693, 77 USPQ 517, 519 (2d Cir.), *cert. denied*, 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379 (1948):

[A]lthough we are chary of all objective absolutes in the field of patents, reliance upon which has done more to conceal and confuse the subject than anything else, courts have with curious unanimity held that it does not avoid infringement to combine into one member that which the patent discloses as two, if the single member performs the duties of both in the same way. The decisions are so numerous that we confine ourselves to citing those with over the last thirty years we have passed ourselves. [citations omitted]

*See also, e.g., Apex Electrical Mfg. Co. v. Maytag Co.,* 122 F.2d 182, 187, 50 USPQ 90, 94 (7th Cir.), *cert. denied,* 314 U.S. 687, 62 S.Ct. 297, 86 L.Ed. 549 (1941) ("Patents are not limited to the structure described and shown, but the invention may be embodied in various forms.... Infringement is not avoided by combining two elements of a claim in one part"); *Specialty Equipment & Mach. Corp. v. Zell Motor Car Co.,* 193 F.2d 515, 518, 92 USPQ 84, 87 (4th Cir.1952) ("one using the substance and essentials of a patented combination does not avoid infringement by varying nonessential details. Neither the joinder of different elements of a patented combination into one, nor the separation of one integral part into two or more doing together substantially what was done by the single element will evade a charge of infringement"); *No–Joint Concrete Pipe Co. v. Hanson,* 344 F.2d 13, 15, 144 USPQ 519, 520 (9th Cir.), *cert. denied,* 382 U.S. 843, 86 S.Ct. 79, 15 L.Ed.2d 83 (1965) ("A substantial body of law recognizes that infringement is not avoided by making into one part that which has been shown as two"); *Magrath v. Draper Corp.,* 384 F.2d 672, 674, 155 USPQ 609, 610 (1st Cir.1967) ("If unification or combination be regarded as omitting something, it is not enough to omit an element when the omission 'is attended by a corresponding omission of the function performed by that element * * * if the elements retained performed the same function as before' ") (quoting *Richards v. Chase Elevator,* 159 U.S. 477, 486, 16 S.Ct. 53, 54, 40 L.Ed. 225 (1895)).

*G*

## Graver Tank is the Culmination of this Extensive Precedent.

The last word, in a century of consideration, analysis, and application of the doctrine of equivalents, reposes in *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950).

In *Graver Tank* the Supreme Court reviewed its precedent, and reaffirmed the guidelines of the past. The Court, quoting from its opinion in *Sanitary Refrigerator Co.,* reiterated that

a patentee may invoke this doctrine to proceed against the producer of a device "if it performs substantially the same function in substantially the same way to obtain the same result."

339 U.S. at 608, 70 S.Ct. at 856. The Court explained that:

One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement.

*Id.* at 607, 70 S.Ct. at 856. The Court made clear that there may be circumstances when the doctrine should be applied to combinations of old elements, as discussed *ante,* and drew no distinction between application of the doctrine of equivalents directly or in "reverse":

[The doctrine] is sometimes used against [the patentee]. Thus, where a device is so far changed in principle from a patented article that it performs the same or similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement.

*Id.* at 608–09, 70 S.Ct. at 856. The Court's body of precedent shows unfailingly that the equitable view of an invention must be as a whole, in order to ascertain its scope and purpose, and the context in which to

place the accused device.[8] This requirement is a consistent prerequisite to serving the interest of justice.

The *Graver* Court rejected the retrenchment urged upon it (see Part IV, *post*) and held that:

> Equivalence, in the patent law, is not the prisoner of a formula....

*Id.* at 609, 70 S.Ct. at 859. The Pennwalt majority's ruling that "the district court correctly relied on an element-by-element comparison to conclude that there was no infringement under the doctrine of equivalents", at 935, is antithetical to the requirements of *Graver Tank* and the solid precedent on which it rests.

The formula with which the majority now seeks to imprison the doctrine defies this mass of precedent. The Supreme Court consistently and expressly rejected the principle adopted by the majority, and declined to restrain the equitable authority of the courts. The purpose of the doctrine to avoid a "fraud on the patent", and our public responsibility, are ill served by the majority's cavalier restatement of the law.

## III

### FEDERAL CIRCUIT DECISIONS

Although this court can, *in banc*, overrule its past decisions, the majority denies that anything is being changed. I view with concern the dramatic changes, in both the law and our judicial authority, made *sub silentio* by this court.

### A

*This court's equitable responsibility should not be abdicated.*

The Supreme Court has often reminded the judiciary, and the nation, of the importance of the equitable powers of courts:

> Congress took care to arm the courts with full equitable powers. For it is the historic purpose of equity to "secur[e] complete justice"

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (quoting *Brown v. Swann*, 35 U.S. (10 Pet.) 497, 503, 9 L.Ed. 508 (1836), and citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98, 66 S.Ct. 1086, 1088, 90 L.Ed. 1332 (1946)).

The doctrine of equivalents fulfills this equitable purpose by requiring courts to look to the invention secured by the patent and, if the technological facts warrant, to depart, in the interest of justice, from the rigorous requirements of literal infringement.

Equitable powers entrain responsibility. The Federal Circuit, over the five years of its existence, accepted this responsibility. In *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389, 222 USPQ 929, 933 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985), we stated our recognition of the principle that:

> The doctrine of equivalents is designed to protect inventors from unscrupulous copyists ... and unanticipated equivalents.

In *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870, 228 USPQ 90, 96 (Fed.Cir. 1985), we reiterated:

> The doctrine has been "judicially devised to do equity" in situations where there is no literal infringement but liability is nevertheless appropriate to prevent what is in essence a pirating of the patentee's invention. (quoting *Hughes Aircraft*, 717 F.2d at 1361, 219 USPQ at 480)

The doctrine can not, by its nature, be reduced to rigid rules. Determination of equivalency is not unlike determination of substantial similarity in copyright law or determination of nonobviousness in patent law. Such determinations require judicial wisdom, not a catalog of narrow rules. The avoidance of rules has not been accidental; to the contrary, it is fundamental to the operation of the doctrine and to the authority of the courts to reach a just result.

---

**8.** Note that the so-called "reverse" doctrine can *only* be applied to the invention viewed as a whole, since by definition all of the elements of the claim are literally present in the accused device, and the issue is whether the device as a whole is so far changed that it nevertheless avoids infringement.

The Court in *Graver Tank* preserved the doctrine of equivalents from becoming "the prisoner of a formula", for unnecessary rules diminish the courts' equitable authority. Until today, the courts considered the imposition of such rules to be "impossible":

> It is obviously impossible to set any theoretic limits to such a doctrine, which indeed its origin forbids, since it is in misericordiam to relieve those who have failed to express their complete meaning.... The usual ritual, which is so often repeated and which has so little meaning, that the same result must follow by substantially the same means, does not help much in application; it is no more than a way of stating the problem.

*Claude Neon Lights, Inc. v. E. Machlett & Sons,* 36 F.2d 574, 576, 3 USPQ 220, 222 (2d Cir.1929) (L. Hand, J.), *cert. denied,* 281 U.S. 741, 50 S.Ct. 347, 74 L.Ed. 1155 (1930).

The effective application of the doctrine depends on the wisdom of the judges who are charged with this responsibility. When properly exercised, the judge-made doctrine of equivalents helps to fulfill the Constitutional mandate "to secure to authors and inventors the exclusive rights to their writings and discoveries." Art. I, § 8.

### B

*Decisions of the Federal Circuit and its Predecessor Courts have been Fully Consistent with Supreme Court Precedent.*

This court's decisions fall smoothly into the categories of the past. No new ground has been broken. This court has conscientiously, and often eloquently, reaffirmed and applied the principles that bind us.

The court has, as indeed it must, continued to review issues of equivalency in the context of the devices (or processes, or compositions) viewed as a whole. The range of equivalents that is available in a particular case depends, of course, on the specific facts. Implicit has been the awareness of how the modified device related to the patentee's invention, viewed as a whole. This judicial constancy is well illustrated in our decisions:

In *Martin v. Barber,* 755 F.2d 1564, 225 USPQ 233 (Fed.Cir.1985) the claims were to a combination of elements which together comprised an ankle-holding device for supporting a person in an inverted position. This court stated:

> To determine whether the Backswing [the accused device] and the claimed invention are equivalent, the fact finder must decide whether the components of the ankle-holding portion of the Backswing, *viewed as a whole,* operate in substantially the same way, and have substantially the same function and result, as the claimed invention. [emphasis added]

*Id.* at 1568, 225 USPQ at 235.

In *Great Northern Corp. v. Davis Core & Pad Co., Inc.,* 782 F.2d 159, 165, 228 USPQ 356, 359 (Fed.Cir.1986), the court said, citing *Graver Tank* and *Hughes Aircraft:*

> *A device* that performs substantially the same function in substantially the same way to obtain the same result as *the patentee's product* may be treated as an equivalent of what is claimed.... [emphases added]

and found that a "construction of the claims ... broader than their literal meaning" was not barred by the prosecution history. *Id.* at 166, 288 USPQ at 359.

In *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1115 n. 2, 219 USPQ 185, 188 n. 2 (Fed.Cir.1983), the court said:

> The matter is not one for semantic antics alone. An infringer appropriates *an invention,* not words. Hence the doctrine of equivalents. [emphasis added]

In *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 658, 229 USPQ 992, 995 (Fed.Cir.1986), this court again viewed the invention in its entirety, stating:

> If the accused *device* and claimed *invention* perform substantially the same function in substantially the same way to give substantially the same result, there is equivalence. [emphasis added]

The *Moeller* court referred to its affirmation in *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 871 n. 7, 228 USPQ 90, 96 n. 7

(Fed.Cir.1985) of "the need to [be] ... 'guided by equitable and public policy principles underlying the doctrines [of equivalence and prosecution history estoppel] involved and by the facts of the particular case.'" *Moeller,* 794 F.2d at 659, 229 USPQ at 996. In *Loctite* this court had remanded for redetermination of infringement by equivalency in view of the overall function of the invention.

In *Amstar Corp. v. Envirotech Corp.,* 730 F.2d 1476, 221 USPQ 649 (Fed.Cir.), *cert. denied,* 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984), this court held that three of the asserted claims were literally infringed, and that the modified *products,* viewed by the court in their entirety,

> are the same, they perform the same function in the same way, and they achieve, as the district court found, the same result as *the claimed inventions. See Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 41–42 [50 S.Ct. 9, 12–13, 74 L.Ed. 147], 3 USPQ 40, 44 (1929). [emphasis added]

730 F.2d at 1483, 221 USPQ at 654. In *Amstar* the appellant argued that the presence in the accused devices of *additional* elements, beyond those claimed, would avoid infringement; to which this court responded, "It is not the law that each element of Envirotech's accused process and product, or an equivalent of each element, must be found in the claims", and stated that only the absence of claimed elements is "relevant". *Id.* at 1484, 221 USPQ at 655. This principle is also stated in *Radio Steel & Mfg. Co. v. MTD Products, Inc.,* 731 F.2d 840, 847–48, 221 USPQ 657, 663–64 (Fed.Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984), relied upon by the majority.

There is nothing in either *Amstar* or *Radio Steel* that supports the majority's new rule of inflexible one-to-one correspondence between every functional aspect of the claims and an accused device. This court iterated in *Atlas Powder,* 750 F.2d at 1579, 224 USPQ at 416, that the determina-

tion of equivalency is not "the prisoner of a formula", quoting *Graver Tank.* In *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1567, 220 USPQ 97, 101, the court said: "Though applicable elsewhere, e.g. in determining infringement under the doctrine of equivalents, there is no legally recognized 'essence' of the invention applicable in determining validity". This court had consistently followed the Supreme Court instruction to look through the form of the claims to the substance of the invention when reviewing assertions of equivalency.

In *Hughes Aircraft,* 717 F.2d at 1364, 219 USPQ at 482, the court remarked on the "striking overall similarities between Williams' claimed satellite and the [accused] spacecraft", and held that the change in the accused device was a mere "partial variation in technique". The court held that the functions of Williams' three claim clauses (e), (f), and (g), although omitted in the accused device, were equivalent to the consolidated and improved function performed in the accused device, viewed in the context of the invention as a whole. The court said:

> The failure to apply the doctrine of equivalents to the claimed *invention as a whole,* and the accompanying demand for "obvious and exact" equivalents of two elements the presence of which would have effectively produced literal infringement, was error. [emphasis added]

*Id.* at 1364, 219 USPQ at 482. The court emphasized that the omitted functions must be viewed in a way that reflects their actual role in the invention, and must not be so narrowly qualified that it is impossible to cover authentic technological equivalents.[9]

In *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 900, 221 USPQ 669, 678 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984), this court in a five-judge panel (Davis, J., dissenting on other grounds) took as estab-

---

**9.** I stated earlier that the *Hughes Aircraft* facts are analogous to those at bar. They are discussed in the dissenting opinion hereof, and I remark only that the fact-dependent question in the present case could easily have been reviewed on the established law. It was not necessary to rewrite the doctrine in order to decide this appeal.

lished that it is the entire invention that must be considered in determining equivalency. *See also Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 655, 223 USPQ 706, 708 (Fed.Cir.1984) (comparing the claimed invention with the accused receivers).

In *Perkin–Elmer Corp. v. Westinghouse Electric Corp.*, 822 F.2d 1528, 1530 n. 5, 3 USPQ2d 1321, 1323 n. 5 (Fed.Cir.1987), the court stated:

> Whether differences were correctly found by the district court between the accused devices and other claim clauses is irrelevant where, as here, the differences in clauses (h) and (i) are such as to cause the accused devices to operate *as wholes* in a way not substantially the same as that in which the claimed devices operate *as wholes.*" [emphases added].

In *Carman Industries, Inc. v. Wahl*, 724 F.2d 932, 220 USPQ 481 (Fed.Cir.1983), the claim was to a combination, some elements of which were stated in functional terms. The court, viewing the invention as a whole, observed that the accused device performs the "principal" function of the invention, that "both devices operate by inducing a similar pattern of flow", and both obtain the same result. *Id.* at 942, 220 USPQ at 488–89.

This court, following the Supreme Court, has recognized that some claim elements may be more important than others, viewed in the context of the invention as a whole. In *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1575, 220 USPQ 1, 4 (Fed.Cir.1983), the claim required "a pair of spaced parallel struts". In the accused device one of these struts was omitted. Although the court observed that the invention was entitled to only a narrow range of equivalents, the omission of this element was not fatal to invocation of the doctrine of equivalents:

> [T]he proposition that the claims, taken in view of the specification, measure the metes and bounds of the invention has been realistically tempered by the judicially-formulated doctrine of equivalents.

*Id.* at 1579, 220 USPQ at 6.

When "essential" elements were omitted, this court (and its predecessors) held that the devices as a whole did not function in substantially the same way, and therefore there was not infringement. In *Autogiro Co. of America v. United States*, 384 F.2d 391, 403, 181 Ct.Cl. 55, 71, 155 USPQ 697, 704–05 (1967) the Court of Claims stated the classic test for equivalency:

> a structure infringes, without there being literal overlap, if it performs substantially the same function in substantially the same way and for substantially the same purpose as the claims set forth[,]

and also considered "a combination claim containing several elements, each considered to be *essential and equal* to all others" [emphasis added]. The court held that: "For there to be infringement, it is necessary that every element or its substantial equivalent be found in the accused structures." *Id.* at 403, 181 Ct.Cl. at 71, 155 USPQ at 707. In *Lemelson v. United States*, 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985) the court stated that each element of a claim is "material and essential", and held that the essential "manipulation means" in the patented combination was absent in the accused device, with no substantial equivalent therefor. In *ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 221 USPQ 929 (Fed.Cir.1984), the court based its decision on the assumption that the omission of the claimed function changed the way the device as a whole worked:

> We infer that the district court *necessarily* found that the Wells device, lacking the claimed function of overriding a locked key switch, does not function in substantially the same way as *the claimed invention.* [emphases added]

*Id.* at 1582, 221 USPQ at 936.

Whether an element is essential is determined with the guidance of the prosecution history and the prior art. In *Chemical Engineering Corp. v. Essef Industries, Inc.*, 795 F.2d 1565, 1572–73, 230 USPQ 385, 390–91 (Fed.Cir.1986), this court held:

> Concerning infringement under the doctrine of equivalents, the district court correctly noted that the prosecution his-

973

tory of the McLean patent established that raising the pH in the specific manner claimed was *crucial to patentability* of McLean's invention, rendering a device that did not raise pH, as is here undisputed, one that did not function in substantially the same way. [emphasis added]

*See also Stewart–Warner Corp. v. City of Pontiac, Michigan,* 767 F.2d 1563, 1571–72, 226 USPQ 676, 681–82 (Fed.Cir.1985); *Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255, 225 USPQ 240 (Fed.Cir.1985).

None of this jurisprudence supports the majority's ruling that every functional aspect of a claim is necessarily an essential limitation, such that if omitted there can be no infringement based on equivalence. The requirement that every part of a "function" must be discretely performed in an accused device, one-to-one, whatever its significance to the invention as a whole, is contrary to the overwhelming body of precedent.

## IV

### THE TENSION BETWEEN THE DOCTRINE OF EQUIVALENTS AND PRECISION CLAIMING IS NOT A NEW IDEA

The Supreme Court has, at least since 1857, remarked on the conflict between the uncertainty inherent in the doctrine of equivalents and the principle that the claim defines the patent right. As discussed in the dissent hereof, this tension has been recognized throughout the history of the doctrine. See, for example, the dissenting opinion in *Winans v. Denmead,* quoted *supra,* and Judge L. Hand's comment in *Claude Neon Lights,* 36 F.2d at 575, 3 USPQ at 221–22:

The doctrine of equivalents, though well settled for many years, is anomalous, if the claim is measured only by its words. . . .

It is plain that such latitude violates in theory the underlying and necessary principle that the disclosure is open to the public save as the claim forbids, and

that it is the claim and that alone which measures the monopoly. . . . The vacillation in the decisions is a necessary consequence of this inconsistency in theory. . . .

The issue was directly confronted in *Graver Tank,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, on rehearing (and rebriefing) the sole issue of the doctrine of equivalents. The *Graver Tank* majority decided in favor of equity, stating that

to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing.

339 U.S. at 607, 70 S.Ct. at 856. The dissent in *Graver Tank* stated the position adopted by the majority today: that patent claims should be strictly construed. The issue was resolved. It is not available for reversal by this court.

It is not available to this court to decide that the doctrine of equivalents can not apply to the invention viewed as a whole. In *Paper Converting Machine Co. v. Magna–Graphics Corp.,* 745 F.2d 11, 19, 223 USPQ 591, 596 (Fed.Cir.1984) (Nies, J., dissenting), the court remarked that "the dissent's argument is based on the utopian belief that a copier 'should be able to look to the patent claims and know whether his (or her) activity infringes or not'". The court wrote:

Although this may be a desirable goal for the patent laws, it it *not* the law as it exists. In particular, the doctrine of equivalents has been judicially created to ensure that a patentee can receive full protection for his or her patented ideas by making it difficult for a copier to maneuver around a patent's claims. [emphasis in original]

*Id.* This court rejected the imposition of a "bright-line test" that would have denied judicial equitable authority.

The vitality of the doctrine of equivalents has been tested and reaffirmed for a hundred years. At its best, it is a guardian of justice and an enemy of fraud. The dramatic consequences forecast in dissent have not occurred, perhaps because the

doctrine depends for its implementation on judicial wisdom. The keeping of that wisdom was entrusted to us.

The position expressed in dissent in *Paper Converting,* and in support of the majority here, was rejected by the Supreme Court in *Graver Tank* and, a century earlier, in *Winans.* Whatever one's personal beliefs on the matter, this court has exceeded its mandate when it bases its decision on a dissent of the Supreme Court. As was stated in *Paper Converting,* "it is not the law".